Table Of Contents Of Appendix

Page

1. May 22, 2006 contracting officer's decision................1
2. Feb. 3, 2006 ALR claim.....................................11
3. Dec. 13, 1999 ALR complaint in ASBCA No. 52467.............77
4. Jan. 18, 2000 Answer in ASBCA No. 52467....................87
5. June 23, 2000 ALR complaint in ASBCA No. 52790.............93
6. July 26, 2000 Answer in ASBCA No. 52790....................98
7. July 21, 1999 ALR claim...................................104
8. Dec. 15, 1999 ALR claim...................................106

**DEFENSE INFORMATION SYSTEMS AGENCY**
DEFENSE INFORMATION TECHNOLOGY CONTRACTING ORGANIZATION
SCOTT FIELD OFFICE (PL8)
2300 EAST DRIVE
SCOTT AIR FORCE BASE, ILLINOIS 62225-5406

IN REPLY REFER TO Net-Centric Services Branch (PL823) 22 May 2006

VIA Federal Express

Ms. Letty A. Norjen, President
Advanced Logic Resources, Inc.
244 Mill Road
Yaphank, New York 11980

Subject: Contracting Officer's Final Decision on Advanced Logic Resources, Incorporated Claim dated 3 February 2006 Against DoD Electronic Data Interchange (EDI) Value Added Network (VAN) License Agreement DCA200-94-H-0015

Dear Ms. Norjen:

The Defense Information Technology Contracting Organization (DITCO) has received your request for equitable adjustment (claim) dated 03 February 2006 against the subject Electronic Data Interchange (EDI) Value Added Network (VAN) license agreement (hereinafter referred to as "agreement"). I have also reviewed Appendices 1-39 forwarded with your claim. Additionally, I advised you on 10 April 2006, that I would require additional time beyond sixty (60) days in order to prepare a Contracting Officer's final decision.

**DESCRIPTION**

License Agreement DCA200-94-H-0015 was signed by Mr. James Edwardson, Chief Executive Officer, Advanced Logic Resources (ALR) and the Government on 9 December 1994 and 3 February 1995, respectively. However, the DoD EDI VAN License Agreement required prospective VANs to complete testing prior to the provision of services, which was done by ALR on approximately 6 June 1995. Hence, ALR could not have been a functioning VAN prior to that time. The original license remained in effect until 17 September 1997, when the license was revised and a new agreement was executed. On 15 January 1999, the Contracting Officer issued a notice of termination of the subsequent agreement. Termination of this Agreement was effective 30 days later on 15 February 1999, pursuant to Article 2, License Term. ALR has indicated that its 3 February 2006 claim arises under the original agreement, which was in effect from 6 June 1995 through 17 September 1997. However, ALR indicates in its 3 February 2006 certified claim that it is for the period of 3 February 1995 through 17 September 1997.

A 1

It is noted that ALR previously filed two certified claims against the DoD EDI VAN License Agreement. ALR's 21 July 21 1999 claim for $8,394,110,175 stated that the Government had not complied with Section 2.1 of the Scope of Work of the VLA, and ALR was requesting compensation for the VAN services that it provided to the Government free of charge. The Contracting Officer denied the claim in its entirety on 25 October 1999. On 13 December 1999 ALR submitted a Complaint before the Armed Services Board of Contract Appeals (hereinafter "ASBCA" or "Board") seeking damages of $9,733,910,270.70 plus interest, which was for the alleged value of ALR's services based upon a per transaction charge. However, during the period of its license agreement ALR did not charge a per transaction fee. Additionally, on 15 December 1999, ALR filed a claim for over $18,093,100,000 in alleged damages due to the Government's supposed failure to return its software, which was denied by the Contracting Officer on 1 March 2000. ALR filed a Complaint before the ASBCA on 23 June 2000, and the Government answered on 26 July 2000. Again, this Complaint did not request lost profits. Both of these claims were appealed to the ASBCA and assigned Appeal Numbers 52467 and 52790. The ASBCA has never taken any action on ALR's two certified claims from 1999; that is, a Hearing on entitlement has never been held.

ALR's 3 February 2006 certified claim for $138,420,000 is labeled a "quantum claim." However, this cannot be a quantum claim, as the ASBCA has never determined entitlement on ALR's previous two certified claims from 1999. Rather, the 3 February 2006 claim is a new certified claim that includes new allegations as to breach, a new form of damages, and a new dollar amount. Moreover, it is my determination that based on the language contained in the 3 February 2006 claim, that the two claims from 1999 have been replaced and superseded by the certified claim of 3 February 2006.

On page 7 of its 3 February 2006 claim ALR states:

ALR will herein show, beyond any reasonable doubt, that:

- ALR is entitled to relief for the damages suffered.
- Such relief should be in the form of recovery of lost profits.
- Such lost profits were unquestionably foreseeable by the Government.
- The lost profits were directly caused by the Government's breach.
- The amount of lost profits claimed by ALR is fully supportable and conservative projection considering the size of the market and ALR's huge competitive advantage over other VANs due to ALR's highly innovative, cost-effective, full FACNET compliant solutions.

In its claim ALR sets forth various alleged breaches of the DoD EDI VAN License Agreement by the Government. These allegations include:

(1) ALR opines, "In order to really understand what FACNET [Federal Acquisition Computer Network] was supposed to be, where it fit in the scheme of things and vice versa, it is truly important to understand its lineage. Now often lineage is not really an important factor. . . . Of course, there are decided exceptions to this 'rule' such as in the case where the question of genetic dynastic continuance is concerned, where 'who is the bastard son of whom' can take on intense implications. . . .

For our purposes (we are going to ignore some less-relevant previous and subsequent undertakings and players), we will say that the seed of FACNET came forth from the National Performance Review (NPR) started in March of 1993." (Claim, p. 8.)

(2) ALR's claim states: "Seeing the potential for a near-future billion dollar annual VAN market, ALR signed the Government's VLA, completed all Government-required certifications and testing and, therefore in early 1995, was accepted by the Government as a fully functioning and licensed VAN eligible to support **both** DoD and FACNET and their suppliers (emphasis added.)" (Claim, p. 5.)

(3) ALR now claims for the first time that the VLA "granted the signatory VANs exclusive rights to this entire market, in consideration for which the VANs were induced to agree to not charge the Government at all for any of the services they provided the Government under mandate of **FACNET**" (emphasis added). (Claim p 12.) ALR also alleges that the future business potential of this government-wide network included the extension of electronic commerce via FACNET:

> . . . beyond the initial single realm of DoD small acquisitions to Government-wide applications such as tax reporting, grants, data collection, and Federally-managed assistance. And the possibilities beyond that point, what with FACNET technology suddenly driving the entire EC world to grow by a multiplier of 20 or more in half a decade to obviously become the de facto world standard, become mind-boggling with the very likely inclusion, officially or not, of State and Local Governments,[1] the general business marketplace, and even an International scope through use of EDIFACT as anticipated by both the PAT Report and the ECAT." (Claim p. 11.)

(4) Based on its view of the FACNET potential, the Appellant now asserts for the first time that it entered into an agreement at some unspecified time with several other FACNET VANs to:

> . . . jointly develop and implement a completely FACNET-compliant solution, utilizing leading edge technologies, that would provide it with a very competitive, state-of-the-service that could far out-perform the often archaic approaches of traditional, but typically far more recognizable VANs.

ALR further asserts that this joint infrastructure called GAP-Net, gave it a substantial competitive advantage over other VANs.

(5) ALR believes that there was another breach of the VLA by the Government; probably more egregious and damaging than those that has heretofore been

[1] There is nothing in the FASA statute, which mandated the creation of FACNET, to suggest the network would apply to anything other than the federal government. *See* Public Law 103-355.

specifically identified by ASBCA. The VLA called for DoD-wide implementation, DoD Implementation Conventions, and VAN support of only DoD agency requirements. But from October 1994 onward, with the signing into law of FASA, VANs were required to support a *Government-wide* implementation, *Federal* Implementation Conventions as well as DoD ICs, and build and test an infrastructure to support *Government-wide* Agency requirements. The Government expanded the scope of the statement of work, in various respects doubled it, without changing the VLA's Statement of Work, all without providing any compensatory consideration thereto for the VANS' additional effort, costs, and risks. (Claim p. 34.)

(6) ALR alleges that the Government failed to enforce provisions of the VLA mandating that VANs be used exclusively for all transactions specified to be handled via FACNET. (Claim, p. 33.) ALR also asserts that the Government failed to maintain FACNET's Schedules by not "meeting the requirements of the Statement of Work and the Implementation Plan referenced in the VLA nor by being able to provide the required systems, interfaces, and more importantly, sufficient motivation to realize the registration of vendors with CCR in a timely manner thereby obviating their mandate to participate in FACNET." (Claim, p. 33.)

These allegations were not set forth in Appellant's July 21, 1999 or December 15, 1999 claims and were not addressed in the contracting officer's final decisions.

(7) ALR opines another breach of the VLA, not specifically identified by ASBCA as a breach in the *GAP* decision, but brought out in testimony during that hearing, the Government signed an agreement with NTIS, to provide them a direct link to the Government's internal NIPERNET to acquire CALS and other Mil-Spec binary data, which NTIS sold to the contracting community, thereby violating the VLA requirements that 'All binary data will be exchanged in ASC X12 841 transaction sets' and 'All electronic transactions will be exchanged via the multi-VAN DoD Hubs. All contractors will send and receive transactions via one of the participating EDI VAN Providers.' (Claim, p. 34.)

(8) ALR's February 3, 2006 claim states, "It is as if the VLA were formed as rules for an indoor ice hockey league, that shortly later decided to play outdoor lacrosse on a field twice the size. The rules should have been immediately changed to reflect new circumstances, for example, removing references of using Zambonis between periods because, lets face it, they just don't work on grass or artificial turf." (Claim p. 10.)

**REFERENCES**

The agreement contains the following terms that are applicable to my final decision.

The purpose of the agreement was stated in ARTICLE 1. LICENSE GRANT - DECCO/RPPS (DEC 1993):

> The EDI VAN Provider hereby provides the Government with the right to have access to the use of its EDI and Value-Added Network Services at no-cost to the Government for the purpose of exchanging business documents and information with individuals and organizations conducting business with the Government throughout the DOD Hub Gateway Computers.

ARTICLE 1. LICENSE GRANT - DECCO/RPPS (DEC 1993) also states that:

> The EDI VAN Provider hereby provides the Government with the right to have access to the use of its EDI and Value-Added Network Services at no-cost to the Government for the purpose of exchanging business documents and information with individuals and organizations conducting business with the Government throughout the DOD Hub Gateway Computers. The network charges that would otherwise be applicable to the Government, for transmission of documents in an electronic format will be waived for the duration of the license agreement. In consideration for the EDI VAN Provider granting the Government this right, the Government agrees that it will not use, resell, or otherwise make available Contractor's services outside the scope of this agreement without the prior written permission of the EDI VAN Provider.

ARTICLE 2. LICENSE TERM - DECCO/RPPS (OCT 1992) gives the Government and the EDI VAN provider termination rights by stating that:

> The license hereby granted may terminate in whole or in part, by giving the EDI VAN provider or Contracting Officer not less than thirty (30) calendar days notice in writing of the date such termination is to be effective.
>
> The term of this agreement shall be for one year. The agreement may be extended for four one-year periods after the Government conducts an annual review of the agreement. At the time of each annual review, the Government will review any changes to the Technical Scope of Work as well as review all terms and conditions contained in the License Agreement including the no-cost provision. If it is determined to be in the Government's best interests, EDI VAN services required after Year One may be procured on a competitive basis in accordance with the Federal Acquisition Regulation.
>
> Revisions to the License Agreement shall be made unilaterally by the Government. Any changes made to the Agreement, its Technical Scope of Work or Addendum A will apply to all signers of the Agreement, i.e., all participating EDI VAN Providers.

ARTICLE 3. PAYMENT - DECCO/RPPS (OCT 1992) states that:

> In consideration for the Electronic Data Interchange (EDI) Value Added Network (VAN) provided by the EDI/VAN provider and the access to the DOD Hubs located at up to two locations for operations and disaster recovery purposes, provided by the Government, as described in the Technical Scope of Work, there will be no monetary charge to either party. Sole consideration shall be the EDI VAN services provided by the EDI VAN provider and access to the DOD data provided by the DOD Hubs.

ARTICLE 7. EXCLUSIVITY - DECCO/RPPS (OCT 1992) states that:

> This license agreement provides for EDI VAN Provider access to the EC data provided as described in the Technical Scope of Work. The DOD Hubs will provide DOD transactions offered under this agreement only to VANs signing this agreement. DOD will not provide these transactions to VANs under other agreements. This license agreement shall be used exclusively for obtaining access to the EC Data provided by the DOD Hubs computer during the term of this agreement.

ARTICLE 9. MINIMUM GUARANTEE - DECCO/RPPS (OCT 1992) states that:

> The magnitude of DOD transactions depends on Congressional appropriations. Therefore, DOD cannot guarantee any minimal level transactions activity at any of its facilities.

ARTICLE 12, CLAUSES INCORPORATED BY REFERNCE, DECCO/RPPS (OCT 1992), incorporates FAR 52.233-1 Disputes DEC 1991 by reference. The agreement does not contain any reference or text of the Changes clauses or any clauses indicating that this is a requirements contract or that any payments were contemplated under the agreement.

The agreement contains an attached Technical Statement of Work (SOW). The purpose of the Technical SOW is stated in section A, OBJECTIVE, as:

> The object of this attachment to the EDI VAN Provider license agreement is to describe the DOD technical approach to electronic commerce using multi-VAN DOD Hubs to exchange transactions with EDI VAN Providers participating in this agreement. It defines technical requirements and procedures for participating EDI VAN Providers. Most functional areas within DOD including procurement, finance, transportation, supply and administration are ultimately expected to use the technical approach described in this attachment. Procurement is the first functional area to use it.

In section B, OVERVIEW, the second paragraph states:

> DOD has set aggressive goals to make electronic commerce a standard way of conducting business in the 1990's. By 1995, DOD plans to conduct 75 percent of its most frequently used business transactions electronically.

In section B, OVERVIEW, also states in the fifth paragraph that:

> DOD will use a phased approach for implementing EDI in its various functional areas and across DOD activities. Procurement and payment transactions have been identified as priority targets for DOD's EC program but all business areas will move to an EC environment when it makes good business sense to do so.

In section N, OTHER CONSIDERATIONS, it states:

> All DOD-to-contractor transactions electronically exchanged as part of this EC program must be exchanged via a participating EDI VAN provider. EDI VAN Providers participating in this agreement will be notified of the schedule of implementation of DOD activities in this EC program. DOD activities will be phased into this program in accordance with a DOD-wide plan.

The agreement also contains Addendum A (DOD Approach to Electronic Commerce for Small Purchases and Other Simplified Purchases). This document will be referred to hereinafter as the "addendum." The purpose of the addendum is stated as:

> This addendum defines how DOD will use the technical approach described in the Technical Statement of Work of this agreement in order to implement a DOD-wide approach to electronic commerce for small purchases and other simplified purchases consistent with the Federal Acquisition Regulation (FAR) and other applicable statutes and regulations.

Section 1, OVERVIEW, paragraph 2, states: "EDI-capable DOD activities will be phased into using this approach based on a DOD-wide implementation plan." The addendum section 2.1, Contractor Use of VAN Services, states:

> DOD will require all contractors desiring to electronically conduct business to only do so with a participating, fully tested EDI VAN Provider. Any contractor may also exchange transactions by other means (i.e., not electronic) in accordance with the FAR and other applicable regulations. DOD will require registered vendors to exchange all electronic transactions via a participating EDI VAN Provider. DOD activities participating in this approach will be phased into it in accordance with DOD-wide implementation plan.

**FINDINGS**

The undersigned Contracting Officer does not agree with your breach allegations as set forth above. The intent of the agreement was never to channel all forms of electronic commerce between the Government and industry via the VAN licensees. As discussed below, the intent of the agreement was to begin a phased-in approach of a limited amount of exchanges of electronic commerce that would be conducted via the DOD Gateway Hubs. The VAN licensees agreed to participate in this program on a no-cost basis. Moreover, the agreement expressly states that the Government cannot commit to any minimum level of transactions. Accordingly, the Government has complied with the agreement.

**CONCLUSIONS**

It is clear from reading the entire agreement, along with its attachment and addendum, that the Government has complied with the terms of the License Agreement, and ALR is not entitled to compensation. The agreement repeats in four places that it is a no-cost agreement. The Government has complied with the non-monetary form of consideration contemplated by the agreement. The License Agreement does not guarantee a certain volume of business for the VAN Providers. Nowhere does the agreement indicate that it is a requirements contract for the conduct of exchanging all electronic transactions. In fact, to the contrary, only certain EC transactions are contemplated to fall within this agreement once they are "phased-in" and are to be conducted under this agreement. The agreement expressly only contemplates a "phased-in" approach for using the VAN providers. Even when this phased-in approach begins to operate, the agreement only contemplates that a certain number of limited transactions are to be handled via the VAN Providers and the Government has complied with these requirements.

Moreover, the Government has fully complied with its requirements under Article 7 of the license agreement. Facsimile transmissions, Internet and direct bulletin board systems do not use the DOD Gateway Hub Computers as contemplated in this agreement. Therefore, facsimile transmissions, Internet and direct bulletin board systems are not within the Technical Scope of Work of the subject license agreement. Since all transactions as listed in the Technical Scope of Work and the Addendum A conducted via the ECI VAN network using the DOD Gateway Hub Centers have been conducted with only the EDI VAN Providers that have signed the EDI VAN license agreements, the Government has not violated the EDI VAN license. The Government has not provided these transactions to any other VAN under any other license agreements or otherwise. Thus, the Government has not violated the terms of the Exclusivity portion of the agreement.

The EDI VAN License Agreement is not a requirements contract between DOD and the EDI VAN Providers. Rather, the license agreement is limited in scope to those transactions involving the DOD Gateway Hub Centers that meet the requirements of the Technical Scope of Work for the Addendum A transactions. The Government has complied with the ARTICLE 7 EXCLUSIVITY portion of the EDI VAN license agreement because all transactions as listed in the Technical Scope of Work and the Addendum A conducted via the EDI VAN network using the DOD Gateway Hub Computers have been conducted with only the EDI VAN Providers that have signed the EDI VAN license agreements.

Additionally, the ultimate volume of transactions contemplated by the agreement is not guaranteed by the Government. The anticipated volume of transactions is only referenced as "goals" that are not binding on the Government. The agreement clearly indicates that a "phased-in" approach for conducting EC would be implemented when it made "good business sense" to do so. ARTICLE 9. MINIMUM GUARANTEE - DECCO/RPPS (OCT 1992) states the Government cannot guarantee any particular level of transactions for VANs. Specifically, Article 9 states "[the] magnitude of DOD transactions depends on Congressional appropriations. Therefore, DOD cannot guarantee any minimal level transactions activity at any of its facilities."

Addendum A, paragraph 2.1, specifically allowed, "any contractor may also exchange transactions by other means (i.e., not electronic) in accordance with the FAR and other applicable regulations." Again, the DoD VAN License Agreement specifically provided that the Government intended to "phase into" electronic commerce with the VAN providers, but did not ever guarantee a certain volume of business for the VANs. The Government has clearly complied with its requirements under the non-monetary consideration portions of the license agreement. During the effective period of the subject license agreement, the Government did not "use, resell or otherwise make available" your services outside the scope of the EDI VAN license agreement in violation of ARTICLE 1. Additionally, the Government provided you with access to the DOD Hub Computers in accordance with its obligations under ARTICLE 3 of the license agreement. Under Article 1, ALR specifically agreed to waive all monetary compensation. ALR could have terminated the agreement at any time, as Article 2 (LICENSE TERM - DECCO/RPPS (OCT 1992)) gives both the providers and the Government unilateral termination rights and also discusses the no-cost aspect of this agreement. The Government has fully met its obligations under these portions of the EDI VAN license agreement.

The agreement does not contain any <u>Changes</u> clause in ARTICLE 12, CLAUSES INCORPORATED BY REFERNCE, DECCO/RPPS (OCT 1992) that would permit recovery from changes to the agreement ordered by the Government. The agreement does not contemplate any forms of monetary compensation. Hence, the agreement is clearly a no-cost agreement. The intent of the agreement was for the VAN providers to collect payments from industry to cover their costs. Therefore, the Government cannot agree to any payments to the VAN Providers for their services during the period of the agreement, nor can the Government pay compensation for alleged lost revenues.

The VLA included paragraph, C.3.3 in the Technical Scope of Work that stated DoD planned to include CALS (Continuous Acquisition and Life Cycle Support) data with some of its Requests for Quotation transaction sets and informed EDI VAN providers they "may" provide services to enable interested subscribers to exchange such data with a DoD activity and translate it into usable forms. There was testimony about this data during the *GAP* hearing. (*GAP Instrument Corp.,* ASBCA No. 51658, 2001-1 BCA ¶ 32,358, 2001 ASBCA LEXIS 47 (March 22, 2001). Included in that testimony is the following statement from GAP's CEO (and ALR's CEO), the late James Edwardson:

> If they [the government] put CALS data on, they would be required to probably have at least two DS3 connections to each VAN, a DS3 connection being about 45 million

bits per second. So basically my conclusion was that you need a minimum of 90 million bits per second.

In fact, some VANs connected at 2,000 bits per second. And there was no way that the data transmission facilities that the commercial VANs were using and the VAN infrastructure had mandated could carry this CALS data.

The Board in *GAP* considered this evidence, and the Board did not determine that these allegations constituted a breach of the VLA by the Government. *GAP Instrument Corp.,* ASBCA No. 51658, 2001-1 BCA ¶ 32,358, 2001 ASBCA LEXIS 47 (March 22, 2001).

Moreover, as ALR subsequently executed a second License Agreement on 17 September 1997, it waived any potential claims under the original EDI VAN License Agreement. ALR's failure to pursue any alleged breach of the original License Agreement prior to executing the subsequent License Agreement has resulted in prejudice to the Government. Accordingly, I have determined that ALR failed to provide notice to the Government of its allegations in a timely manner. Lastly, ALR's claim for lost profits is barred by the *CACI* and *Simplix* decisions. *CACI International, Inc., ASBCA* Nos. 53058, 54110, 2005-1 BCA ¶ 32,898, 2005 ASBCA LEXIS 36 (April 29, 2005) and *Simplix,* ASBCA No. 52570, 2006 ASBCA LEXI 26 (March 14, 2006.)

**DECISION**

In summary, I have reviewed your claim dated 3 February 2006, and it is my final decision as Contracting Officer for the subject license agreement that your claim is DENIED in its entirety for the above stated reasons. This is the final decision of the Contracting Officer.

You may appeal this decision to the agency board of contract appeals. If you decide to appeal, you must, within 90 days from the date you receive this decision, mail or otherwise furnish written notice to the agency board of contract appeals and provide a copy to the Contracting Officer from whose decision this appeal is taken. The notice shall indicate that an appeal is intended, reference this decision, and identify the contract by number. With regard to appeals to the agency board of contract appeals, you may, solely at your election, proceed under the board's small claim procedure for claims of $50,000 or less or its accelerated procedure for claims of $100,000 or less. Instead of appealing to the agency board of contract appeals, you may bring an action directly in the United States Court of Federal Claims (except as provided in the Contract Disputes Act of 1978, 41 U.S.C. 603, regarding Maritime Contracts) within 12 months of the date you receive this decision.

Sincerely,

Debra D. Santoro

DEBRA D. SANTORO
Contracting Officer

Copy to:
Cyrus E. Phillips, IV
Attorney at Law
1828 L Street NW, Suite 660
Washington, DC 20036-5104

A 10