# QUANTUM CLAIM FOR BREACH
# UNDER CONTRACT NUMBER DCA200-94-H-0015

RE: ASBCA Nos. 52467, 52790, Appeals of Advanced Logic Resources, Inc.

ALR

Advanced Logic Resources
244 Mill Road
Yaphank NY, 11980

A 11

## TABLE OF CONTENTS


Page

A. INTRODUCTION ........ 4
Overview ........ 4

B. STATEMENT OF THE FACTS ........ 8
FACNET ........ 8
The VAN License Agreement ........ 12
ALR Background ........ 16
The GAP-Net Alliance ........ 16
ALR's FACNET Advantages ........ 18

C. STATEMENT OF THE CASE ........ 29
FACNET Problems ........ 29
The Breach ........ 32
Additional Government Damage to ALR ........ 35

D. ALR's CLAIM ........ 37
Quantum Determination ........ 37
The "But For..." World ........ 39
EDI Expert Statement ........ 44
ALR's Remarkable Achievements ........ 44
Financial Data ........ 50
ALR's Lost Profit Summary ........ 56

E. SUMMATION ........ 58
ALR and the VLA ........ 58
Conclusion ........ 63


## APPENDIXES


01 — PAT Report
02 — VAN License Agreement
03 — ALR Pricing Analysis
04 — DOD EC/EDI VAN/VAS Compliance/Certification List
05 — ASBCA Decision Re GAP Instrument Appeal No. 51658
06 — DoD/EC Newsletter Dec. 1997
07 — Total FACNET Cost Estimate
08 — ALR Certification Message from JTIC
09 — ALR Certification Completion Announcement
10 — VA Testing – GAP-Net Internal eMail
11 — GSA eMail to VANs Via DISA
12 — GAP-Net VANs' Site Inspection Report from DISA
13 — GAP-Net VAN Sales Brochure
14 — ALR *adVANtage* Software Description

15 — ALR *xpEDIter* Software Description
16 — Implementing EDI for Program Management
17 — GAP-Net VAN/VAS Educational Flyer
18 — Federal ECAT Report
19 — Federal Procurement and EC Improvement Act 1997
20 — GAO Report on FACNET Obstacles
21 — Inspector General Audit on BBS Use in DoD
22 — ASBCA Decision Re CACI Appeals 53058&54110
23 — Questions to Ask a VAN
24 — ALR/FACNET Expert Evaluation
25 — List of DoD Certified VANs
26 — Total VAN Market Analysis
27 — Résumé of EDI Expert Mark Malatak
28 — 838 Data Collection
29 — DISA/DoD EC Infrastructure System Test Plan
30 — Denial of Government's Misuse of ALR Intellectual Property
31 — Offer of GAP-Net VAN Software to other VANs
32 — CPA Statement Re ALR Projected Income and Expense
33 — Presidential Memorandum "Streamlining Procurement"
34 — GAP-Net IC Support List
35 — GAP-Net GSA Tri-fold Brochure
36 — Sample Federal Implementation Convention "003050F840_1"
37 — Memo from WAWF Support Group to Finally Use GS08 Properly
38 — ALR Advertisement
39 — GAP-Net Salary Situation

## TABLE OF FIGURES

| | Page |
|---|---|
| FIGURE 1 – DOD SUPPORTED EC IMPLEMENTATION & OUTREACH SITES | 26 |
| FIGURE 2 – SIGN-UP OF THE 300,000 FACNET VENDORS PER MONTH DURING VLA-1. | 41 |
| FIGURE 3 – SIGN-UP OF THE 36,000 FACNET VENDORS BY ALR DURING VLA-1. | 42 |
| FIGURE 4 – PROJECTED STATEMENT OF INCOME AND EXPENSES FOR ALR | 51 |
| FIGURE 5 – FUTURE DOD APPLICATION AREAS | 56 |

## A. INTRODUCTION

### Overview

Advanced Logic Resources, Incorporated (ALR) has been operating in the networking services and computer hardware integration business since the 1980's. In 1994, ALR decided to leverage its networking experience by becoming a Value Added Network (VAN) in support of the U.S. Government's DoD and FACNET initiatives.

FACNET, the Federal Acquisition Network, was born out of the Presidential National Performance Review and the Federal Acquisition Streamlining Act of 1994 (FASA) that mandated that the Federal Government simplify and empower its acquisition systems through the implementation of Electronic Commerce (EC). Prior to the FASA mandate the DoD EDI initiative was guided by a Process Action Team (PAT) Report of December 1993[1] which established a very aggressive plan to provide a "single face to industry" via a complex, but well-conceived network architecture based on employment of ASC X12 Electronic Data Interchange (EDI) standards. The PAT Report required DoD internal purchasing elements to migrate to the new EDI system, along with their some 300,000 suppliers, per a two-year implementation plan covering the first phase of the project. When FACNET later came into being the ongoing DoD initiative was incorporated into FACNET and DoD remained tasked with operational control of FACNET's infrastructure. A Federal EC Acquisition Team report[2] defined the Government's FACNET initiative in similar manner and vein as the PAT Report defined the previous DoD initiative.

A key component of the new architecture was the inclusion of commercial Valued Added Networks (VANs) that would provide the interface between the Government side and all non-Government participants. VANs were essentially electronic post offices, conversant in ASC X12 EDI, which were tested and certified by the Government to handle the transfer of all electronic transactions to be exchanged between the Government and its vendors. Such transfers might be passive or, as the name implies, Value Added Networks could provide a host of additional services, such as translation to and from X12-coded transaction sets and computer or human interfaces. Within FACNET such translation services and computer programs were referred to as Valued Added Services (or Value Added Software) and a company that provided them was therefore called a VAS. While a VAN could opt to perform as a VAS, in whole or in part of its operations, for the most part this was somewhat outside the traditional role of the VAN. VASs could operate independently, selling their software or services to the FACNET marketplace. However, for both VASs and VANs it was required that their EDI-aware products be tested and certified by the Government as being truly FACNET compliant as determined against all the specific details of the scores of individual Implementation Conventions (ICs)[3] developed solely for FACNET.

---

[1] The PAT Report appears as Appendix 01.
[2] The ECAT Report appears as Appendix 18.
[3] An implementation Convention (IC) is a detailed re-specification of a single version of any X12 EDI transaction set that explicitly defines for some subset of trading partners using said transaction set which optional portions of the complete X12 specification are to be used, what are to be the allowed data encodings, and what other conditions may apply. The reason for such formal prior agreement is to

The Government, through both the PAT Report and ECAT Report, called for establishment of a VAN License Agreement to define the relationship with the VANs. DoD produced its VAN License Agreement (hereinafter VLA or VLA-1)[4] that established the terms and requirements imposed upon VANs that became its signatories relative to the DoD initiative. No such VLA was established to cover FACNET, although FACNET work proceeded under the DoD VLA. Chief among the DoD VLA provisions was the demand that the VANs not charge the Government for any of the services they provided under the VLA. Instead, the Government promised to require that its suppliers[5] contract with one of the VLA VANs in order to do business with the Government. The VANs would then pass all their operational charges on to the suppliers.

Seeing the potential for a near-future billion dollar annual VAN market, ALR signed the Government's VLA, completed all Government-required certifications and testing and, therefore in early 1995, was accepted by the Government as a fully functioning and licensed VAN eligible to support both DoD and FACNET and their suppliers.

While ALR certainly possessed the networking and hardware experience required to be a VAN, it realized that it would not be as strongly positioned as various other VANs in terms of such other factors as EDI software experience, in-depth Government contracting knowledge, and database technologies. ALR also soon realized that the huge scope of the FACNET EDI initiative, while based on ANSI X12 standards, would require a great deal of non-standard additional functionality to meet the many very peculiar aspects of the Government's evolved and legislatively mandated needs.

Accordingly, ALR entered into a joint developmental agreement with three other FACNET VANs to design, develop, and implement a completely FACNET-compliant solution, utilizing leading edge technologies, that would provide it with a very competitive, state of the art service that would far out-perform the often archaic approaches of traditional, but typically far more recognizable VANs. This alliance with GAP Instrument Corp. (GAP), Eloco, Inc. (ELO), and Government Procurement Assistance Service (GPAS), Inc., resulted in the joint development of GAP-Net, the total across-the-board infrastructure that was built from the ground up to exactly meet all DoD and FACNET specifications. The GAP-Net alliance had its own special synergy in that GAP brought to the table the expertise gleaned from its 40+ years as a Government Supplier, primarily for Department of Defense (DoD) contracts, Eloco primarily provided systems development support, drawing considerably on its database technological expertise, and GPAS contributed financially.

While the four separate VANs that built GAP-Net were teammates in that endeavor, they also were naturally competitors in the expected rush for market share once FACNET lived up to its stated potentials. To replace friction among the team members with synergetic proaction, the four VANs also established various marketing strategies,

---

preclude situations where the business processes of any trading partner could be compromised by the inclusion or omission of some exchanged encoding that is respectfully unanticipated or required. Such a sample IC appears as Appendix 36.

[4] The VAN License Agreement appears as Appendix 02.

[5] See VAN License Agreement, Appendix 02, page A-16.

designed to operate not only singularly, but in concert wherever feasible. To improve the individual competitiveness of each individual VAN and to minimize the scope of effort that each would likely have to develop to compete totally separately, the four VANs established a functional division of the marketplace and each targeted a separate segment, with ALR concentrating on those higher echelon suppliers with extended requirements, such as those requiring increased bandwidth networking, custom hardware or software interfaces, or special support needs such as a need for multiple processing points within their internal operations.

There were three main keys to the success of the GAP-Net architecture:

- It brought together in one unified package the very right pieces of new technology that provided many competitive, state of the art advantages, plus
- It was built upon a huge underlying bandwidth capability that offered economies of scale far beyond what traditional VANs could provide, and
- This combination of factors enabled the creation of an entirely new, bundled pricing model that offered far more capabilities at a stable annual price.

ALR, thanks to its GAP-Net teaming and infrastructure, was certified to handle all of FACNET's transaction types, a competitive advantage far beyond that of any competing VAN or VAS[6]. No competing VANs/VASs were able to certify for more than 15 percent of that standard and, therefore, by FACNET's operating policies, were prohibited from the processing of such transactions, and therefore service of all the Government business carried by such transactions.

But while FACNET implementation was obviously proving difficult for those other VANs and VASs, it was also proving just as difficult for the Government. Despite repeated complaints by the VANs, numerous pleas and demands by the Government both internally to its agencies and externally to its supplier base, FACNET consistently fell behind schedule. By 1996, the VLA-prerequisite Centralized Contractor Registration (CCR) process was more than a year behind schedule. The Defense Information Systems Agency (DISA) complained to but could not shut down, wildcatting agencies and purchase points that were utilizing Electronic Bulletin Board Systems (EBBS) and other means to circumvent and/or undermine FACNET and its inherent threat to their existing, decentralized worlds. The supplier base, suffering through a period of extensive business decline, refused as a whole to make any investment or commitment to EDI and its associated computerization until they could see circumstances change enough to force them to either commit or close doors. Eventually FACNET imploded; new legislation was proposed by as early as May 1997 to throw out the mandates of FASA.[7]

---

[6] See list of DOD EC/EDI VAN/VAS Certifications, Appendix 04.

[7] As example, the proposed "Federal Procurement and Electronic Commerce Improvement Act of 1997" called for repeal of such FASA provisions as "Certification of FACNET capability", "Certification of government wide FACNET capability", "Implementation of full FACNET capability". According to its proponents, it "repeals all references to FACNET." See Appendix 19.

The VANs, including ALR, investing heavily in providing new services to the Government because of promises of future profits that now clearly were not to materialize, found themselves facing very significant losses. Accordingly, VANs, primarily those that had made the greatest commitments and contributions to FACNET, in terms of their technical, human, and financial resources along with future prosperity and viability, started to file suit against the Government for breach of contract. In the first such case to be adjudicated, the appeal of GAP Instrument Corp.,[8] the Armed Services Board of Contract Appeals (ASBCA) found that the

> Government made a promise which it did not keep... the promise had business value ..., because ... contractors ... would have had no choice but to use the services of the ... VAN providers of which appellant was a member. ... [A]ppellant has shown that the issue of damages is not purely academic and that appellant has incurred some damage.

Quantum determination was left to future processes and it is to this process that ALR is hereby applying.

ALR will herein show, beyond any reasonable doubt, that:

- ALR is entitled to relief for the damages suffered.
- Such relief should be in the form of recovery of lost profits.
- Such lost profits were unquestionably foreseeable by the Government.
- The lost profits were directly caused by the Government's breach.
- The amount of lost profits claimed by ALR is a fully supportable and conservative projection, considering the size of the market and ALR's huge competitive advantage over other VANs due to ALR's highly innovative, cost-effective, full FACNET-compliant solutions.

[8] See Armed Services Board of Contract Appeals (ASBCA) GAP Appeal No. 51658, Appendix 05.

## B. STATEMENT OF THE FACTS

### FACNET

In order to really understand what FACNET was supposed to be, where it fit in the scheme of things and vice versa, it is truly important to understand its lineage. Now often lineage is not really an important factor. We typically should care, for example, more about who and what a person *is*, than who or what their forebears were. Of course, there are decided exceptions to this "rule" such as in the case where the question of genetic dynastic continuance is concerned, where "who is the bastard son of whom" can take on intense implications. And to quite some extent, this latter situation applies to FACNET because, as we shall see, things were truly not begat in as straightforward a manner as might be expected.

For our purposes (we are going to ignore some less-relevant previous and subsequent undertakings and players), we will say that the seed of FACNET came forth from the National Performance Review (NPR) started in March of 1993. This six-month undertaking was initiated by President Clinton, took on the question of government-wide performance, and was designed to report on ways in which various forms of significant cost savings or increased productivity could be realized.

The NPR report led to the Presidential Memorandum of October 26, 1993, Streamlining Procurement through Electronic Commerce[9], in which the president called for Electronic Commerce to be employed to make more efficient the Government's 200-billion dollar annual purchasing processes. It established several implementation guidelines:

- Define a Government-wide architecture by March of 1994.
- Establish an initial electronic commerce capability between the Federal Government and vendors by September 1994.
- Implement a full-scale electronic commerce system by July 1995.
- Complete Government-wide implementation of electronic commerce for applicable purchases by January 1997.

To these goals was added a decree to accelerate these dates where possible.

Meanwhile, DoD had been striving toward Electronic Commerce since the 1980's. DoD had already established and tested various EDI initiatives, and their energies only gained more impetus after the Presidential Memorandum. A Process Action Team was charged to investigate and report how DoD should best continue moving into the world of EC/EDI.

[9] Presidential Memorandum, Appendix 33.

Their PAT Report[10] was finalized in December of 1993. Among other things, the report called for a multi-tiered operational architecture wherein Agency elements would interact with Gateways that transfer all their EDI transactions to two redundant Hubs (aka Network Entry Points (NEPs) that would provide a "single face to industry" via connection with licensed VANs who would support the Government's commercial trading partners. It also proposed and created the initial version of the VAN License Agreement (VLA) and provided a detailed implementation plan whereby over 200 DoD sites should be migrated to the architecture over a two-year period. Program management for the functional infrastructure and operations was stated as the responsibility of the Office of the Under Secretary of Defense (Acquisition & Technology) (OUSD(A&T)) while program management for the technical infrastructure and operations was stated as the responsibility of the Office of the Assistant Secretary of Defense (Command, Control, Communications & Intelligence) (C3I) and to be executed by DISA.[11]

The VLA then clearly was a direct product of the 1993 PAT Report. Strangely, the writers of the PAT Report had created the VLA words to the effect that work covered during the first phases of VLA would be in accordance with a DoD-wide implementation plan. Such plan was never subsequently produced; rather, the implementation plan in the PAT Report itself became the VLA plan. The plan in the PAT Report basically called for there to be VANs signed-up and ready to perform by the sixth month mark of the two-year plan, which was deemed to have started near the end of March 1994.

In January of 1994 the Federal Electronic Commerce Acquisition Team (ECAT) was commissioned. On October 13, 1994 they produced a report, also called *Streamlining Procurement through Electronic Commerce*, that remarkably coincided with the conclusions of the PAT Report. On that same date President Clinton signed into law the Federal Acquisition Streamlining Act of 1994 (FASA) that, in addition to raising the small purchase threshold from $25,000 to $100,000, mandated that by January 2000 there be Government-wide implementation of EC/EDI in the acquisition arena and that the entire Government seek all appropriate avenues to reduce costs and increase efficiencies through employment of EC/EDI throughout their business practices. It also mandated the creation of the Federal Acquisition Network (FACNET) which would provide the infrastructure to support these initiatives.

The ECAT report[12], which in its final appendix (N) introduced FASA and FACNET, claimed that its described architecture "was consistent with the purpose and intent of" FASA. This architecture included the same arrangement of agencies, Gateways, NEPs, licensed VANs, and commercial trading partners as was presented in the PAT Report. Also as in the PAT Report, it called for a "single face to industry", the use of standard X12 EDI according to federal-specific implementation conventions, the creation of a single vendor registration point for government-wide access, and the use of a vendor Trading Partner Agreement (TPA) and a VAN License Agreement. It went so far as to say

[10] The PAT Report, "DoD Electronic Commerce (EC)/Electronic Data Interchange (EDI) in Contracting Report" appears as Appendix 01.
[11] PAT Report, Appendix 01, Volume 2, page 3.
[12] ECAT – Federal Electronic Commerce Acquisition Team in their October 1994 *Streamlining Procurement Through Electronic Commerce* Report, Appendix 18.

> *... that the one to many transactions (that is, the RFQs and notice of award) must be routed to a network entry point (NEP or DOD Hub) for proper distribution to the "public."*[13]

This was because it assigned DoD the job of continuing its existing work of creating an operational infrastructure, except now it wouldn't just be for DoD it would be in support of the Government-wide initiatives of FASA's FACNET. Project management over all agencies, including DoD of course, was placed under the Federal Electronic Commerce for Acquisition Program Management Office (ECA-PMO).

Suddenly the VLA world changed. Instead of only being a DoD-wide initiative, this project now was a government-wide undertaking called FACNET. The VLA and PAT Report never once use the word FACNET, simply because FACNET hadn't been created until the appearance on the scene of FASA a half-year later. Everyone, DoD, other Federal Agencies, the VANs, and the vendor community, now knew that this was now the world of FACNET. This was how it was referenced, correctly, by all parties, officially and unofficially. It explains why thereafter, as VANs, we were dealing with other Federal Agencies participating in the town hall meetings, why we were performing compliance testing based on Federal Implementation Conventions (ICs) as well as on DoD-specific ICs. It also explains why the expected market that the VANs planned to divide was no longer the DoD's 300,000 number, but the Federal "2 million suppliers on-line by the year 2,000" number.

There seems no doubt, in retrospect, that the VLA should have been rewritten and resigned by all parties at this time to reflect the new project dimensions. Yes, DoD was continuing, as far as DoD was concerned, along the same internal implementation path set forth in its original PAT Report, the creator of the DoD VLA. But DoD was also now responsible for, and the VANs would now have to respond to, the whole Federal side as well. A new VLA should have reflected this, and also established a true, dynamically maintained project-wide implementation plan that included VANs, CCR, and vendor deadlines, instead of the DoD-centric, obsolescent plan from the PAT Report.

It is as if the VLA were formed as rules for an indoor ice hockey league, that shortly later decided to play outdoor lacrosse on a field twice the size. The rules should have been immediately changed to reflect the new circumstances, for example, removing references of using Zambonis between periods because, let's face it, they just don't work on grass or artificial turf. But this was never done and it explains some strange omissions and the reason why what everyone knew they were doing wasn't all reflected in the VLA – and why with so much more on the plate, no one had the time to sweat what was seen as "the small stuff." All those rules about ice skates, boarding, and pre-freezing the pucks, which we're still arguing about a decade later, pale in importance when we should be understanding such facts as the game now had twice as many players, the field was twice the size, and that various players now had positional restrictions where free-roaming across the field could result in offside penalties.

---

[13] Ibid, pg xxxix.

OK, so maybe this whole silly analogy is too much of a stretch. But the point is the game changed; certainly not entirely, but to not understand and somehow take into account the effective differences, to fail to assess the resulting situation in light of the evolution (revolution?) that took place, to us makes about as little sense as rigidly playing to the old rules. That is not to say we don't understand and appreciate the problems inherent in this. We do appreciate that our only contract, our only *legal* basis, as flawed as it is, is the VLA. We realize that law is supposed to be a black-or-white, right-or-wrong process. It's just that the changeover of scope from DoD-internal to FACNET's myriad government-wide ramifications presents a far larger, grayer world in which justice cannot fully be served by blindly following the written path of the DoD-myopic VLA.

The Deputy Under Secretary of Defense for Acquisition Reform was made responsible for the implementation of the Phase 1 of FACNET which called for a DoD-wide implementation wherein all DoD suppliers of small purchases, estimated at the time to be over 300,000, would be registered at a single registration point (Central Contractor Registration (CCR)) and then, solely through connections provided by various Value Added Networks (VANs) licensed by the Government under a VAN License Agreement (VLA-1)[14] be converted to Electronic Commerce trading partners. It was anticipated that FACNET would simplify the purchasing process, increase competition between suppliers, encourage small vendors or sub-contractors who were not already registered suppliers to register and become active, and thereby bring down the costs of purchased goods, through such means as increased competition, removing middle man mark-ups, and applying the benefits of automated systems.

Therefore it was established that for the first phase of FACNET there were more than 300,000 existing suppliers[15], plus some significant but ultimately unknown quantity of new registrants that would form the base of the marketplace for which the twenty-some VANs would compete. However, according to the 1994 ECAT Report[16]

> *There are currently 639,000 CAGE codes ... A recent DLA internal study estimates the CAGE data base is 80 to 83 percent current.*

This indicates that the number of DoD suppliers could well be over 500,000, based on their lower figure of 80 percent. Furthermore, there were other estimates that there should be two million trading partners on-line by the year 2000 with the benefits of EC having been extended beyond the initial single realm of DoD small acquisitions to Government-wide applications such as tax reporting, grants, data collection, and Federally-managed assistance. And the possibilities beyond that point, what with FACNET technology suddenly driving the entire EC world to grow by a multiplier of 20 or more in half a decade to obviously become the de facto world standard, become mind-boggling with the very likely inclusion, officially or not, of State and Local Governments, the general business marketplace, and even an International scope through use of EDIFACT as anticipated by both the PAT Report and ECAT.

---

[14] The VLA appears as Appendix 02.
[15] When DoD finally had CCR working and decided on a new sign-up strategy in 1997, they began to send out 318,000 notices to potential registrants. See DoD Electronic Commerce Newsletter December 1997, Appendix 06.
[16] ECAT Report, Appendix 18, page 3-8.

It was the possibilities of such a huge future market that induced the VANs to sign the no-cost VLA with the understanding that their primary risk would be riding-out the high-cost development period time until July 1995 when "a full-scale Federal EC system that expands initial capabilities to include electronic payments, document interchange, and supporting data bases" was to be implemented per the President's Memorandum and the ECAT Report.[17] After all, a "full-scale" system that includes "document interchange" has to have a significant number of vendors included, right? VANs also were well aware of statements in the VLA and the PAT and ECAT reports to the effect that the Government should consider replacing the no-cost approach after the first year of operation.

## The VAN License Agreement

Whatever the true size of this potential market for the VANs, conservatively estimated to surpass the billion dollar level annually within the timeframe of VLA-1[18], only those authorized, fully certified VANs licensed for FACNET would be allowed to compete.[19] This was firmly established in the VLA itself.[20] The VLA, for which DISA was given the responsibility to administer, granted the signatory VANs exclusive rights to this entire market, in consideration for which the VANs were induced to agree to not charge the Government at all for any of the services they provided the Government under the mandate of FACNET. This was a revolutionary arrangement as in the commercial VAN world prior to FACNET, VANs played the role of electronic post offices, passing transmissions between trading partners, typically charging both parties in every such exchange regardless of which was the originator or the receiver. The Government knew that VANs would pass on the charges they incurred for the Government's usage of their services to the suppliers, quite possibly doubling their transmission fees, due to this traditional dual-directional charging approach. As discussed between the Government and VAN representatives long before any VAN signed the VLA:

> *...VANs believe that the Government should pay its fair share of communications costs particularly as it relates to pure one-to-one transactions and that these costs should not be passed on to Government suppliers through increased VAN services costs.*[21]

While a no-cost arrangement certainly would look good on Government balance sheets for the first year or two, the prospect of increased charges to the vendors to cover all the Government usage certainly risked vendor rejection on the basis of FACNET appearing to be too expensive, the long-term savings benefits not yet being realized.

---

[17] ECAT Report, Appendix 18, page 1-6.

[18] Per prevailing VAN pricing and practices at the time. See example in Total VAN cost Appendix 07.

[19] ALR became initially certified as a full-fledged VAN under VLA-1 in the early part of 1995. Later, the Government instituted far more stringent bandwidth and throughput compliance testing by JTIC, DISA's testing group, which ALR passed with flying colors. In addition, a site inspection by DISA representatives was required to verify a great many aspects of VAN operations, such as backup procedures, communications capability, system reliance and fallback procedures, disaster preparedness and recovery procedures, etc. The DISA report vouching for GAP's successful completion can be found as Appendix 12.

[20] See VAN License Agreement, Appendix 02, page A-14.

[21] See Pat Report, Appendix 01, page 139.

> *The commercial ... infrastructure required for connectivity and capacity may not be cost effective for some organizations...*[Risk Impact:] *Some organizations may not be able to conduct EDI... Perception by Industry that DoD lacks commitment.*[22]

The VAN License Agreement established various requirements for the VANs of which the following are particularly noteworthy:

- VANs would provide the Government unlimited "access to the use of its EDI and Value Added Network Services at no cost the Government for the purpose of exchanging business documents and information with individuals and organizations conducting business with the Government throughout the DoD Hub Gateway Computers."[23]

- The VANs were to accept individual transactions from the Government intended for its vendor community as a whole and "required to make these public transactions available to all interested subscribers"[24] through the regeneration of new transactions to each such subscriber and/or through other means.

- The VANs were given the mandate to *enable* their customers "to receive and send ASC X12 transaction sets following the DoD implementation conventions for the ASC X12 standards"[25] thereby essentially demanding that the VANs provide VAS services, directly or indirectly.

In exchange for these and other VLA mandated services, the Government through the VLA contracted to assure that "All contractors will send and receive transactions via one of the participating EDI VAN Providers."[26] Expanding on this were other relevant requirements:

- As "DoD hubs will provide DoD transactions offered under this agreement only to VANs signing this agreement" the VANs exclusive marketplace was contractually defined.[27]

- "All DoD-to-contractor transactions electronically exchanged as part of this EC program must be exchanged via a participating EDI VAN Provider."[28]

- "DoD will require all contractors desiring to electronically conduct business to only do so with a participating, fully tested EDI VAN Provider."[29]

[22] Ibid, page 178.
[23] See VAN License Agreement, Appendix 02, page A-1
[24] Ibid, page A-7
[25] Ibid, page A-9
[26] Ibid, page A-15
[27] Ibid, page A-3
[28] Ibid, page A-14
[29] Ibid, page A-16

Through its reference to a detailed DoD Implementation Plan, the VLA called for implementation of the original 200+ DoD sites, with their 300,000+ vendors, during a two-year period. The implementation plan and VLA, neither being annually updated as expected by the PAT Report, essentially ignored both the remaining years of the VLA license period and the effects of FASA that in October 1994 created FACNET, usurping the VLA scope and expanding it by its Government-wide EC implementation mandate.[30] The effect of the above provisions of the VLA, when implemented, would be the de facto imposition of an "EDI or DIE" dictum upon these 300,000+ DoD suppliers, and the trading partners of other agencies. Either all these suppliers would have to become customers of one of the licensed VANs, and through them, directly or indirectly, make their business processes EDI capable, or they would be faced with the loss of all their related business with the Government.

While the VLA certainly doesn't discuss matters beyond what was produced in the PAT Report in 1993, ALR certainly spent considerable time and energies supporting FACNET and its Government-wide initiatives. As just a few examples of this:

- As can be seen from the attached brochure[31] ALR supported the GSA Cataloging initiative, GSA Advantage. Note that the attached eMail message from GSA announcing this program was sent to all the VANs by DISA.[32]

- ALR set up to perform end-to-end testing with the Veteran's Administration. An internal GAP-Net operations eMail message explains the process.[33] Note that the Veterans Administration itself had 180,000 vendors.

- Of the 139 Implementation Conventions (ICs) that ALR had identified and was set up to validate and process[34], roughly half were in support of Federal Agency initiatives, while the other half were in support of DoD. Each IC was a unique description of how a particular type of EDI transaction was to be encoded and interpreted throughout FACNET by all parties A typical IC, 003050F840_1, for a Federal Request for Quotation transaction set, is included; it can be seen that this sample is 226 pages long.[35] Virtually everything on these pages, except the sections with the gray backgrounds, had to be analyzed and encoded into several database tables in order for the table-driven validation routines to process the respective transaction sets. This clearly represented a very significant development effort for a VAN/VAS, yet was only a portion of what was necessary

[30] Yes, the DoD endeavored to update the status of their own slice of the pie, providing periodic reports to the VANs indicating the status of their various identified sites as they endeavored to bring them on-line, and their "town hall" and telephone conferences certainly provided updates on the progress and problems of various project factors, both within DoD and occasionally beyond onto the Federal side. But there never was a coherent, comprehensive implementation plan provided to the VANs that covered the full FACNET development undertaking and thereby provided a full overview of the original plan along with periodic updates reflecting current project status in detail. In fact, FACNET was never contractually mentioned, and was virtually ignored except for the extra work it required of VANs.

[31] Appendix 35, GAP-Net GSA Tri-fold brochure.

[32] GSA eMail message, Appendix 11.

[33] GAP-Net internal eMail on VA, Appendix 10.

[34] See Appendix 34, an extract from a GAP-Net database table that lists the 139 ICs.

[35] Sample Federal Implementation Convention, Appendix 36.

to become compliance certified for a single transaction set. From this brief overview, it can readily be seen why it was so highly unlikely that very many companies would be able to certify as being their own VAN/VAS.

There were additional thoughts within DoD, and even in the ECAT Report, which indicated that the Government, locked into old model thinking, thought that there was some significant value in the VANs acquiring for free the legion of "Public" RFQs that the Government planned to release each day through FACNET. You see, prior to FACNET's EDI revolution, the suppliers had the means to respond to solicitations (paper, stamps, fax), but they couldn't easily get all the solicitations themselves. They had to reregister individually with all these separate agencies, search the Commerce Business Daily, or hire an agent to do the work for them of matching their capabilities with the Government's needs across some 1,400 bulletin boards and other sources, all a time-killing and expensive process.

But with FACNET, the situation would become reversed. It would be easy for suppliers to get all the solicitations; in fact, GAP-Net saw them as "commodity" items and was publishing them all on the World Wide Web for public access (to the ire of some of the other VANs that also thought these "Public" addressed RFQs still had intrinsic value). What was now the hard, expensive, and risky part for suppliers was efficiently sifting through these millions of RFQs, even if they were in one free public place, finding those that were right for their business, and then responding in proper EDI formats as required by FACNET in the time frames allowed. With EDI, the value had changed from the RFQs themselves to the specialized services supporting the response process, particularly as the bidding periods were expected to continue shrinking through the automation of processes on both Government and vendor sides. Those VANs that could provide suppliers with sharply tailored, highly efficient, cost-effective bid matching services and totally-FACNET intelligent bidding management systems that were certified to handle (and therefore allowed to process and submit) any and all FACNET transaction sets, would win the hearts and minds of the supplier community. After all, the VLA *required* the VANs to make all "Public" addressed transactions available to the vendor community; charging vendors separately for this would just be another aggravation. What was now most important was the ability to provide something like the GAP-Net integrated *adVANtage* and *xpEDIter* systems that:

- Gave vendors fine control over what bids they received so that they would neither be swamped nor miss any ideal opportunities,
- Provided bidders with highly efficient RFQ review, analysis, and management routines,
- Included the empowering capabilities of very user friendly, graphical, bid-intelligent interfaces[36] that allowed easy but fully detailed and compliant bid generation, and then,

[36] See the many easy to understand functions available in *xpEDIter* from the sample screen shots in Appendix 15.

- Guaranteed the quick delivery of validated bids over wide, high-speed communications channels, by providing integrated, automated transaction monitoring and error recognition and correction from the user system to the Government Hubs and beyond.

FACNET's *raison d'etre* was automation, efficiency, and cost effectiveness at all levels.

## ALR Background

In late 1994 the officers of ALR saw the potential business opportunities that would accrue to the VANs when the Government met its published plans for FACNET. Although ALR had a strong background in computers and networking, ALR quickly realized that the many complexities of FACNET meant that it could not handle the huge development tasks and funding on its own. Accordingly, ALR looked for other partners that could share the many burdens of becoming fully FACNET compliant in the very short time frames required by the Government's self-described "aggressive" schedules.

Early in the planning and development process, ALR realized several key factors that clearly were being missed by other FACNET players:

- The Traditional VANs were mainly relying on their archaic networks, technologies, and/or billing procedures that could not easily and inexpensively meet the huge demands of FACNET once it reached production levels.

- The full FACNET specifications were such that they called for customized solutions based on application of innovative high-tech systems and procedures.

- Rather than just be content to be another small niche VAN, there was a terrific opportunity for an assertive and nimble VAN with Government bidding savvy that could bring to market a total FACNET solution with the underlying bandwidth to more than handle all demand. Such a powerful system would provide unparalleled economies of scale that it would not only allow, but demand, a completely different, bundled cost model that would be far more enabling and cost-effective for customers.

## The GAP-Net Alliance

Accordingly, early in the process of developing its own infrastructure, ALR entered into an agreement with two other recently licensed FACNET VANs to jointly develop and implement a completely FACNET-compliant solution, utilizing leading edge technologies, that would provide it with a very competitive, state-of-the service that could far out-perform the often archaic approaches of traditional, but typically far more recognizable VANs. GAP Instrument Corp. (VAN ID: GAP) and Eloco, Inc. (VAN ID: ELO) were the other two VANs that inaugurated the joint development of GAP-Net, which was the total across-the-board operational infrastructure that was built from the ground up to exactly

meet all FACNET specifications. GAP brought to the table its wide Government contracting expertise gleaned from its 40+ years as a Government Supplier, primarily for Department of Defense (DoD) contracts, and Eloco primarily provided systems development support, drawing considerably on its database technological expertise. Eventually, a fourth VAN, Government Procurement Assistance Service, Inc. (GPAS; VAN ID: PAS), joined the GAP-Net team, but as the allocated GAP-Net development tasks were well along in initial implementation by this time, the primary contribution of the small GPAS operation was financial, helping to meet, what were for these small companies, the huge financial demands necessary for such an undertaking.

While the four separate VANs that built GAP-Net[37] chose to maximize the use of their resources by pooling their respective contributions in a synergetic manner that created a much stronger infrastructure than could have been created by any of them individually, they also were faced with the fact that they naturally were competitors in the expected rush for market share once FACNET executed its published schedules and forced companies to comply with the new EC/EDI mandates. To reduce friction between these allied VANs and preclude overreach among any of them, thereby maximizing their combined total market penetration, the four VANs also established various marketing strategies, designed to operate not only singularly, but in concert wherever feasible, usually under the banner of their joint high-tech infrastructure, GAP-Net[38]. In particular, the four VANs had private, proprietary marketing and profit distribution arrangements whereby they all could expect to profit to varying degrees from the success of their shared GAP-Net technology. To improve the individual competitiveness of each respective VAN and to minimize the scope of effort that each would likely otherwise have to develop to compete totally separately trying to offer across-the-board solutions, the four VANs established a rough division of the marketplace that meant that, as in the case of the operational infrastructure where they each needed to only develop a fraction of the total requirement, they could develop a workable business solution that was designed to only address the particular needs of their respective market segments.

So GPAS, the smaller operation which was dedicated to assisting the formation and growth of small business suppliers, who typically were those companies that were not at all ready for computerization, looked to tailor its package to support that lower segment of the market place. While it would, of course, use the GAP-Net *adVANtage*[39] solution to provide it with all the necessary VAN functions, it would only provide conversion to and from FAX, telephonic, and similar low technology services for those customers that wanted, or could only afford, that very basic level of service.

ELO also targeted lower levels of the supplier base, although it would provide eMail support and the just then developing World Wide Web technology to provide access for those suppliers that felt that they were not ready to commit, at least at the present time, to the financial and personnel demands of the fully computerized and extended capabilities offered by the GAP-Net *xpEDIter*[40] software client system that resided on a

---

[37] DISA clearly laid to rest any possible thoughts that these were not four distinct and separate VANs in its Site Inspection Report, Appendix 12.
[38] For example, see an early 1995 GAP-Net sales brochure included as Appendix 13.
[39] See Appendix 14 for details on *adVANtage*, the GAP-Net VAN software system.
[40] See Appendix 15 for details on *xpEDIter*, the GAP-Net EDI client software system.

computer at the client's office, but was seamlessly integrated with the *adVANtage* servers.

GAP and ALR designed their offerings to split those remaining customers who would be utilizing *xpEDIter*, GAP concentrating on those with standard needs at the base, but fully bundled level and cost, while ALR positioned itself to be able to support those customers with any extended or special requirements, such as those requiring ISDN and other increased bandwidth networking implementations, using non-standard or requiring other special hardware interfaces, requesting custom application software interfaces, expecting special training and/or support needs, and/or likely to be looking at acquiring volume licensing agreements to place *xpEDIter* at multiple processing points within their internal operations.

Clearly, by concentrating on these particular, and rather incompatible, market segments, the four VANs could again minimize their individual investments, in terms of finances, people, time, and other resources. Developing their respective targeted levels of service meant that they would not need to be spread thinly across-the-board, but through specialized focus would be much stronger than what could be offered by the typical, fully stand-alone VANs, by concentrating all their effort and resources only within their particular segment of overall market need.

Each VAN then, would not need to worry about the other three as competitors and could concentrate on their particular area of strength. In addition, ALR would know that inquiries to any of the other three VANs by vendors with needs falling in the ALR specific area would result in a very positive referral. And such referrals, whereby one VAN directs a potential customer to one of its apparent competitors with a strong, detailed recommendation as to why this VAN would be ideal for the needs of the inquiring vendor, should have a startling and powerful business effect.

## ALR's FACNET Advantages

ALR intended to fully commit its resources toward maintaining itself as a fully certified FACNET VAN, establishing itself as a leader in the field. While the then current competing base of VANs, although not large in number, did contain some well established concerns with very high name-recognition, ALR realized that their large size would actually prove to be a disadvantage for them. The reason for this is that at its heart this opportunity was a race for market share. FACNET was based on a very aggressive schedule. Those that would meet that schedule and stay at the top of the Government's own, published lists of compliant VANs/VASs[41], based on FACNET's myriad testing results and certifications, would have to very nimble. Meanwhile, the huge VANs had consistently shown an inability to get their imagined steamrollers into gear, let alone up to speed.

ALR already had a very significant competitive lead by virtue of its GAP-Net teaming that provided it a synergy of different resources and capabilities. By choosing to provide a

[41] See list of DOD EC/EDI VAN/VAS Certifications, Appendix 04

completely new solution, designed specifically and fully to FACNET specifications, and based not on the technologies of yesteryear, but of tomorrow, ALR was able to provide a perfectly tailored solution that other VANs could not mimic, due to their continued dependence on their old money-maker technologies, into which the new, evolving model of FACNET continually proved to be an unworkable fit.

ALR, with its GAP-Net alliance, made a tremendous investment in the future by designing and building a network with huge bandwidth capabilities. With twelve pairs of installed and tested fiber optic lines in place at the GAP-Net processing center ALR was provided a capacity more than sufficient to handle the telephone communications of New York City. In fact, when the GAP-Net VANs were load-tested by the Government, they were apparently tested at the rate of 10,000 transactions *per hour*, instead of 10,000 transactions per day as was the requirement and which was used for other VANs. Whether this happened due to the fact the Government was possibly attempting to overrun or simply verify our claimed capabilities, or through some misadventure as mundane as the possibility that they made a mistake, due to the GAP-Net VANs likely being the first to test under the Government's newly prepared procedures, is unknown. With the operation of its digital network built on series of distributed, but interactive, low-cost, off-the-shelf, but state-of-the-art processors, ALR had a flexibility and ease of growth unmatched by VANs committed to their obsolescing mainframe- and mini-computer-based architectures.

This combination of a huge bandwidth underlying network, a fully modular, inexpensive processing engine, both combined in a commitment to an all Internet-based solution, the newest of the five original choices allowed by FACNET but which soon clearly became the Government's own single approach of choice, provided ALR tremendous economies of scale that couldn't apply to VANs still grounded on old technologies such as X.25 and other telephony-based networks or large mainframe computers with their long development and implementation lead times and high costs.

With the modular approach, instead of one of those expensive behemoths, ALR relied on a distributed slew of inexpensive commercial-off-the-shelf (COTS), but state-of-the-art, commodity-type PC servers. On break down all that is necessary is that operation personnel quickly pull out the old unit, move a new one into its place, restore from a backup (or just literally pop in one of the mirrored, pluggable hard drives from the old unit), turn the new unit on, and off it goes again, from where it last was processing, with down time measured in minutes, rather than the hours, days, or weeks associated with mainframe computers.

The GAP-Net *adVANtage* VAN suite of software could run totally modularly in that we could take any number of customers, (for just one, or any or all of the four participating VANs) assign them to one computer hanging anywhere in the country off the Internet, and let that module run on its own. Actually, there would be three computers as GAP-Net employed a double backup architecture, wherein just by swapping the IP addresses we could quickly switch over to either of the other two sites if one went down. Centralized database information could still be shared via nightly replication or other more real-time means. Through load testing we performed, we had determined that we could run approximately a thousand customers on one PC. But if for some reason that turned out