to only be 400, no matter, just buy some more servers. Even one computer-full of only 400 customers each paying an up-front fee of $3,600 would buy a lot of servers to cover those customers that would follow. And only three or four customers covered the computer costs for the whole first 400 customers, or 1000 as we projected. The way PC server costs kept dropping at the time while performance increased, the number of supportable customers per PC would only increase.

It should be noted that this modularity of design provided ALR (and the other developers of GAP-Net) with an additional expected source of revenue. Once the Government started enforcing its rules and stopped sending transaction sets to VANs that had not certified for them and therefore were not allowed to process them, there was an expectation that some of those VANs, suddenly realizing the hopelessness of their situation, would need to acquire a new infrastructure virtually immediately or otherwise take exceptional risks. The GAP-Net VAN system was offered to other VANs on a fifty-fifty revenue split basis (or as may otherwise be negotiated), which would allow such VANs to place their customers on servers running at GAP-Net sites and/or at sites and servers provided by those VANs[42]. It was the modularity of design that would allow the apparent independent operation of such additional VANs' clients, while the systems were still being monitored and maintained by GAP-Net's centralized control center.

For the GAP-Net VANs, all of this technology was the easy part; it was the rapid company growth in sales, technical support staff, and all the internal infrastructure that was the most challenging aspect, once the system architecture had been so well designed.

Certainly in the very beginning, there had to be some smoke and mirrors here and there as we hustled from scratch, learned what really had to be done, and got up to speed, but, ask the Government, *adVANtage*, ALR's VAN operations software, clearly worked far better than anything else at the time! And it still works! It is a source of no small wonder to still see *adVANtage* cranking away over in the corner of ALR's now much diminished offices, particularly when it is understood that originally we had knowingly developed it as a prototype, fully expecting it to be rewritten two or three times by the time FACNET was at full steam. But it is the original prototype system implementation that still runs today, virtually unchanged from the days when FACNET still thought it had a real future.

ALR offered a revolutionary pricing structure[43], unimaginable in the old world of traditional VANs. Instead of the approach of nickel-and-diming its customers to death with myriad, seemingly inexpensive charges that can't help but add up to very high totals when faced with the unique, overly convoluted world of Government Purchasing, ALR provided its customers with a single, up-front cost, that not only would provide them full, **unlimited** communication services of a VAN, but integrated an across-the board FACNET processing solution that easily merged into their own offices via an off-the-shelf PC, with

---

[42] One such eMail offer appears as Appendix 31. This is from early 1997 and was addressed to several new or underachieving FACNET VAN sign-ups that were having difficulty in becoming fully compliance-checked and operational.
[43] See ALR's Pricing Comparison Against Other VANs, Appendix 03.

powerful software providing state-of-the-art, very user-friendly, and totally FACNET aware interfaces.[44]

The myopic, old guard of the VAN world couldn't see how this would even be possible. And, truthfully, to the uniformed, the bundled cost at passing glance may seem high, when compared against those published prices of traditional VANs with so many of their costs hidden. But once any knowledge of the situation is gained, the bundled approach, which ALR foresaw as destined to become the general norm as the Internet continued to expand, clearly offers a terrific bargain.[45] As case in point, Sperry (Unisys) on Long Island had long used an existing commercial VAN to handle all their EDI communications. When that pass-through VAN started handling the very large transactions sets of FACNET traffic for them, they soon were faced with bills reaching into five figures **per month!** Which goes to show how far things can add up when you're paying for every thousand characters being transferred in either direction. Sperry was thrilled with a GAP-Net based *annual* bill that was a small fraction of those *monthly* bills, even though they continued to use the other VAN for their commercial world connections, where the model of simple pass-through of small transaction sets better applied.

Even without the direct motivation of situations such as this one, companies in Sperry's class, already with a very high EDI budget and associated sophisticated computers, networking, and support staff wouldn't even blink at the ALR FACNET costs, as they would anticipate that the operational savings of automation efficiencies in these areas would more than cover the costs over time. In fact, the response from any such vendors already exposed to the high-cost of big-time EDI and the add-on price practices of traditional VANs would be more likely to ask, "Where's the catch?" finding the ALR $3,600 annual fee for the unlimited use of so many functions a bargain leaning more toward the too-good-to-be-true genre than the too-pricey side.

An in-depth look at the supporting material within and attached to this Document should easily prove that this allied approach combined with the GAP-Net high-technology infrastructure had, by orders of magnitude, greater capabilities and effectiveness relative to FACNET's peculiarities, than any other VAN could even begin to claim.[46]

There were three main keys to the success of ALR's GAP-Net infrastructure:

- First of all, it brought together into one unified package, the very right pieces of design and new technology to address the FACNET requirements. While perhaps arguable as to whether this happened more by genius or extraordinary luck, there is no doubt that decisions to:
    - Use the Internet as its primary transport medium,
    - Ignore the advice of other VANs/VASs and develop a custom solution,

---

[44] See Appendix 15 for details on *xpEDIter*, the GAP-Net EDI client software system.
[45] See Appendix 07 Cost of the Total FACTNET Market and note comparison of ALR's fully bundled solution against only the per kilo-character charge employed by traditional VANs.
[46] For one example, see the Pricing Analysis and Cost Comparison between ALR and a traditional VAN in Appendix 03.

- Utilize expendable COTS PC servers instead of heavy-duty, expensive main-frame or mini-computer technologies,
- Immediately deploy total table-driven validation against all EDI transactions down to the lowest Federal IC levels, and
- Acquire an exceptional amount of bandwidth,

Created a capability with such competitive advantages that ALR was able to blow away the competition in all Government-measurable areas.

- Secondly, it was built upon a huge underlying, state of the art, digital network allowing a tremendous data throughput capability. This offered considerable bundling of services and economies of scale unimaginable with the old approaches and technologies utilized by the traditional VANs whose existing networks were mostly based on analog telephony connections using old X.25 networks. While such older technologies, with their pay-for-every-play mentality[47] had indeed been the standard, workable approach useable for the small, simple financial transactions typical of commercial EDI to that time, they could not help but be cost-prohibitive and overburdened with the implementation needs of the complex and significantly larger transactions required in FACNET's unique implementation of EDI and the resultant expansion of total EDI usage from perhaps only as many as 75,000 total users in 1994[48] to the 300,000+[49] on-line users within the initial two year implementation of FACNET and a number of suppliers in the millions after the year 2000 as expected because of FASA's mandate of Government-wide usage of EC.
- Finally, the third factor was the creation of an entirely new pricing model made possible by the aforementioned technological advances. Because FACNET failed to fly, it is harder to demonstrate just how innovative and crucial to FACNET's future this model would have proven to be. But FACNET was so huge in concept and details, that the then-current pricing models would have proven cost-prohibitive. Being able to give far more in performance and services, while doing so for a stable, lower total price, would have forced the other VANs to revolutionize their systems and procedures, assuming they had remained in competition.

For projections of future needs, ALR had comprehensive spreadsheets to monitor and project revenues and costs. These are the same resources used to support the Financial

[47] See ALR Pricing Analysis, Appendix 03, for descriptions of hidden charges utilized by other VANs.
[48] The PAT Report, Appendix 01, written in 1993, suggests only 30,000 total users nationally on page 138.
[49] It is unknown how many of the 300,000 or 350,000 vendors projected in FACNET documentation for the initial two-year implementation phases would already be included in the less than 75,000 total EDI user community current in 1994. While surely there would be some small number of overlap, it is suggested here that the vast majority of the 75,000 EDI users were retail, automotive, transportation, and other commercial-oriented trading partners that surely should not be counted as existing DoD vendors. In any case, such numbers should have been more than offset by the expected increase in registrations of the many new vendors that FACNET's simplified acquisition approach was designed to generate.

Section data below. With everything customer-oriented, any increase in the number of customers, meant all the staff/computer/cost projections went up. If we were afraid some cost might be a little low, we'd just double it; it typically doesn't have any great effect on the bottom line, once the first couple months of growth are passed. Each computer set of three would cost just $9,000. GAP-Net operations had plenty of space in a cost-deferred building with plenty of power and communication capabilities. Yes, the latter would have cost many thousands of dollars a month as their separate switches were thrown on, but our estimates expected us to be able to support 200,000 customers on them. And if that level were exceeded, we had already had plans in place to move some operations to an abandoned SAC base in Omaha and also to Arizona where huge communication pipes were cheaply available, should our existing bandwidth in New York ever somehow be exhausted, perhaps by many huge data packets being transmitted or whatever.

The success of the GAP-Net teaming was clearly apparent when viewed in terms of its capabilities and achievements as compared to those of the other VANs and VASs. As determined by DISA, the program management office and technical overseers of FACNET, GAP-Net VAN operations and software capabilities, as measured via DISA's comprehensive compliance and certification testing requirements, provided a competitive advantage far and away beyond that of any competing VAN or VAS. ALR, thanks to its GAP-Net infrastructure, was certified to handle all of FACNET's transaction types.[50] No other VANs/VASs not using the GAP-Net infrastructure were certified for more than 15 percent of that standard and, therefore, by FACNET's operating policies, were prohibited from the processing and exchange of all other transaction types with the Government.

As indicated before, in the final analysis, the FACNET opportunity for the VANs was a race for market share. When the Government would finally close down all other purchasing routes and force the use of FACNET as it was legislated and contracted to do, the vast majority of DoD and Federal suppliers who had been procrastinating on this decision would suddenly be in a panic to sign up or risk losing more business. For this, the GAP-Net VANs had a concerted strategy in which they would utilize a surge of aggressive marketing support services to ensure that the message of the GAP-Net VANs was made clear and that these allied VANs, combined, gained a very high percentage of market share. Prior to and concurrent with this surge, various innovative techniques primarily conducted under the GAP-Net banner would be used to educate and draw suppliers.

As an example, whereas other VANs were, true to form, charging both their existing and potential customers for all the communications and services associated with the submittal and approval of their lengthy EDI-based registration documents to the Government's Centralized Contracting Registry (CCR), GAP-Net VANs offered both automated and human-support services for free to any potential suppliers to beat the impending rush at CCR with early "pre-registration." Of course, in doing this, CCR automatically associated each such supplier with a GAP-Net VAN, as CCR needed to have a VAN assigned in order to respond. Later, when the company wished to formally sign-up with a VAN, they would discover that they already are a GAP-Net VAN on CCR's records, and while there is no commitment whatsoever precluding them from signing with another VAN at that

[50] See list of DOD EC/EDI VAN/VAS Certifications, Appendix 04.

time, they would nonetheless have to go through the process of transmitting the appropriate Change of VAN Registration transactions, which could result in delays and, most likely, incurrence of the other VAN's hidden communications fees[51]. Avoiding this extra hassle could well be the deciding factor to instead go ahead and sign-up with the GAP-Net VAN in question, providing such suppliers had not already grasped the so many better reasons for doing so.

As can be seen by a quick look at the ALR EC/EDI Comprehensive Registration Form and Instructions, registration, when done right so that it would afford the most potential benefit to the registrant's future business, was a complex undertaking.[52] There also was a short, one-page version that was utilized for the free registrations ALR offered; these would be amended by the comprehensive form, once a vendor contracted with ALR.

Actual marketing was set to be handled by a core in-house marketing and support team, swiftly augmented with external professional marketing groups at points where opportunities were increased due to Government pressure on the supplier base. These existing sales representative organizations would have pre-training so that they could be activated with very short lead times. They would be supported by the home office marketing and technical support groups, augmented by extensive fax, postal mail, eMail, and Web based activity. The representatives would be authorized to provide multi-license and extended term discounts, give-away sign-up premiums and personal inducements, and offer other sign on incentives such as first month free whereby potential customers can evaluate the ALR VAN service and the *xpEDIter* software in-house to ensure that its operation meets all that it is advertised to be and is truly capable of meeting their needs. Again, this free trial gets suppliers signed-up with ALR as their official VAN with CCR, making it all the less likely that they would bother with the extra time and effort to change over to another VAN after that point, particularly after they had seen what a powerful bidding tool *xpEDIter* was. The strategy here was to pretty much do anything to get vendors to look past the big names, because when vendors truly understood the extensive capabilities and wide-ranging value of the GAP-Net solutions versus the limited offerings of the other VANs and their hidden charges, they should not be able to allow the situation where their competitors have the advanced benefits of GAP-Net and they don't.

These advantages included, among others:

- Bundled annual price that allows customers peace of mind from the industry's typical add-on over-charges.
- User-friendly, automatically updated client software with Government bidding intelligence built-in.
- Unlimited, high-speed communications, including ISDN interfaces.

[51] See the Pricing Analysis and Cost Comparison between ALR and a traditional VAN in Appendix 03.
[52] See Appendix 28.

- Automatic, user-configurable and extendable bid searching, with opportunities assignable to separate bidding managers.
- Full range of bidding capability from fast and easy QuickBids to complete, detailed, FACNET support.
- Integrated VAN and client software allowing free and unlimited bi-directional reconfiguration.
- Bidding histories data.
- Detailed context-sensitive Help systems built into *xpEDIter* and backed by free, unlimited technical support.[53]

In addition, ALR offered numerous extended options to provide more functions and performance for the advanced user while creating additional revenue for ALR. As just one example, the Government required that each unique registrant, down to the contact level, have a separate D-U-N-S number in order to be identified. What that means in the world of FACNET is that 1 D-U-N-S number must = 1 CCR registry entry = 1 VAN mail-box = 1 supplier point = 1 *xpEDIter* license. So if a vendor company makes both pins and needles, for instance, but needs to have each of these two groups have their own computers for internal efficiency and/or the convenience of the Government in terms of separate contacts and communications, they need to register again with CCR for the second supply point specifying another D-U-N-S number. The main reason DISA chose the D-U-N-S number as the only official identifier for FACNET EDI is that its standard allows the appending of up to 10,000 unique, user-defined, subordinate D-U-N-S numbers for each official D&B-assigned D-U-N-S number. Note also that a particular vendor company might have numerous official D&B-assigned D-U-N-S numbers as these are assigned by D&B per entity per location. In our pins and needles example, we find that 2 D-U-N-S numbers (1 by D&B, 1 by the vendor) = 2 CCR registrations = 2 VAN customer mail-boxes = 2 supplier points = 2 *xpEDIter* licenses.

A "single supplier" such as The Boeing Company, with multiple operating sites and myriad product and/or parts lines might well be expected to utilize a great many of the available 9999 sub-D-U-N-S numbers, and, in truth, be that many true suppliers and, consequently, distinct customers of one or more VANs. Companies in Boeing's class, already with a very high EDI budget and associated sophisticated computers, networking, and support staff wouldn't even blink at the ALR FACNET costs, as they would anticipate that the operational savings of automation efficiencies in these areas would more than cover the costs over time. In fact, the response from any such vendors already exposed to the high-cost of big-time EDI would be more likely to ask, "Where's the catch?" finding the ALR $3,600 annual fee for unlimited use of so many functions a bargain leaning more toward the too good to be true genre than the too pricey side.

---

[53] For a comparison or all of ALR's features and detailed comparison against prices charged by other VANs, see Appendix 03.

A final point to make in regard to ALR's marketing and operational advantages is that there can perhaps be no greater testimony to the excellence of ALR, and its GAP-Net solutions, than that offered by the Government itself. While naturally it is incumbent upon the Government to not appear to take favorites, the Government does have a great many regulations and tests that it, in good business practice, must make against each VAN in order to determine that the VAN is compliant with the various operational requirements specified by the VLA, and therefore qualified to provide such services within FACNET.

The results of the various tests, conducted both on VAN operations and the software used by VANs, VASs, and suppliers that generate and process the many variations of X12 transaction sets utilized by the Government, are posted on DISA Web sites not only to keep track as to whom was allowed to process what, but as part of the Government's continuing effort to educate its vendors and to assist them in becoming successful, fully FACNET-enabled trading partners. These Web sites were also referenced, and the information from them promulgated to potential FACNET vendors, via the EDI Help Desk maintained by the Government. In like manner, the various Electronic Commerce Resource Centers (ECRCs), funded by the Government and distributed throughout the country (see Figure 1) with the mission of providing enabling services to their respective regional supplier bases, also directed potential FACNET suppliers to these Web sites and reproduced the information contained therein for use in the various seminars and other training aids they provided to vendors.




**Figure 1** – DoD Supported EC Implementation & Outreach Sites
Source: SBA/DoD EC/EDI Implementation in Contracting Handout, 1995, page 56

Here are two entries from the DOD EC/EDI Compliance Certification Facility Web site (dated 19 November 1996 and displayed here with non-relevant data omitted)[54] that demonstrate the wonderful testimony DISA (unintentionally, of course) gave[55] to ALR's processing capabilities:

| Network Name (VAN/VAS) | Transaction Set(s) | X12 Version/Release |
|---|---|---|
| **ALR** | 840, 843, 850, 997 | 2003 MADES I |
| | 840, 843, 850 3010 | MADES II |
| | 836, 840, 843, 850 | 3010 SACONS |
| | 997 | 3010 SACONS |
| | 836, 840, 843, 850 | 3010 SAACONS |
| | 997 | 3010 SAACONS |
| | 824, 836, 840, 843 | 3010 REWORK |
| | 850, 864, 997 | 3010 REWORK |
| | 810, 820, 824, 836 | 3040 |
| | 840, 843, 850, 855 | 3040 |
| | 864, 997 | 3040 |
| | 824, 832, 836, 840 | 3050 |
| | 843, 850, 855, 860 | 3050 |
| | 864, 865, 997 | 3050 |
| **GE Information Systems** | 843, 864, 997 | 3040 |

Now, it might well be imagined that the choosing of the second VAN above is done on the basis of it having the poorest showing. This is truly not the case; rather this VAN was selected because with only three certifications – versus the 45 shown at the time for ALR – it represents the ***average*** number (actually a bit higher than that) of the certifications achieved by all of the other VANs that, well after the end of the initial two-year implementation phase had managed to achieve *any* certifications at all (other GAP-Net VANs are excluded).

If the very lifeline of your business was dependent upon your continued trade with the Government, would you select a VAN that hadn't been able to become certified for Request For Quotation Transactions (set 840), and therefore would not be allowed to process and provide such transactions to you? Or, perhaps worse still, would be prevented by the Government Network Hubs from transmitting to you Purchase Order Transactions (set 850)? Could that, by any stretch of the imagination, be worth the (mis-) perceived difference of a few hundred dollars – a sum that up to now you were likely passing on to bid agents to search bid boards for you at potentially 1,400 DoD separate sites and could soon drop?

Could the other VANs ever catch up to ALR in any meaningful time frame? The answer is clearly, not easily, if at all. In most cases, they had already had as much (or even

[54] The full list appears as Appendix 04.
[55] DISA and others provided many references to the VAS Certification List on the DISA web site, or to the EDI Help Desk which referred vendors to the list, thereby aiding ALR's marketing. See Appendix 16, page A-3 and A-5 for just one such example.

more) time as ALR to become certified, yet had not been able to do so. Performance of the compliance certification testing by the Government was a time-consuming business, open to only a very small number of all VANs/VASs at a time on a first-come, first-served basis as new requirements were released. In the crunch time period of signing, processing, and satisfying an average total of over 12,000 new vendors a month, VANs with missing certifications would concurrently be facing a significant testing bottleneck that should severely impair for an indefinite period their ability to gain market share during that most critical period when competition would be the most intense.

ALR firmly believes that for these main reasons, along with their many competitive details as defined in our attached supporting documentation[56], ALR was extremely well positioned to capture a very significant portion of the FACNET supplier marketplace when the Government finally met its published schedules and cut off all other electronic purchasing access, thereby forcing the 300,000+ DoD vendors to become EDI compliant via the VANs as required by FASA and VLA-1.

---

[56] See the following supporting documents for details on the many ALR competitive advantages:

Appendix 03, ALR Pricing Analysis
Appendix 04, DoD EC/EDI Compliance Certification List of November 1996
Appendix 08, ALR's JTIC Certification
Appendix 09, ALR's Certification Completion
Appendix 12, VANs Site Inspection Report from DISA
Appendix 14, ALR's *adVANtage* VAN Software Description
Appendix 15, ALR's *xpEDIter* Client Software Description
Appendix 17, VAN/VAS Comparison Brochure
Appendix 34, GAP-Net Implementation Convention Support
Appendix 38, ALR Advertisement

## C. STATEMENT OF THE CASE

### FACNET Problems

While FACNET implementation was proving difficult for the other VANs and VASs, it was also proving difficult for the Government. Despite repeated complaints by the VANs, and numerous pleas and demands by the Government both internally to its Agencies and externally to its supplier base, FACNET consistently fell behind schedule.

By early 1996, the critical Centralized Contractor Registration (CCR) process was a year behind schedule. According to the United States Government Accountability Office (GAO), in its January 1997 report "*Obstacles to Implementing the Federal Acquisition Network*" DoD reported in October 1996 that "only about 4,000 of an estimated 300,000 contractors had validated registrations in the [CCR] database"[57] and therefore were eligible to participate in FACNET. That's barely over 1 percent. The report also indicated that it wasn't until October 1996 that the DoD provided Web site and modem dial-up interfaces to CCR to allow contractors a free means of direct registration[58] – but thereby violated the VLA requirement to use EDI's 838 Trading Partner Profile transaction sets through those VANs, such as ALR of course, that had developed such capability per FACNET specifications. ALR did offer free registration more than a year before this. However, this new supposed cure-all for CCR's problems, blamed incorrectly by some DoD personnel on the VANs, didn't work either. In June of 1997 there still were less than 3 percent of the expected vendors registered in the CCR database. Late in 1997 DoD started another program to contact 318,000 vendors and get them to register with CCR,[59] but it too did not work. Eventually, in mid-1998, the Government finally told vendors that they would no longer be paid unless they registered. This quickly resulted in about 150,000 vendors registering. This is the sort of action that the Government should have taken starting on day one of the project as a requirement toward making FACNET successful.

A chilling line appears in DoD's response to the GAO audit, "To our knowledge there is no official documentation which established a time line for the completion of the population of CCR."[60] That DoD should state this in November 1996, well after the end of the VLA's two-year implementation period, begs the question as to how on earth, without the participation of their "over 300,000 active vendors", they expected FACNET, and the VANs who relied on the immediacy of that market to offset their huge development and operational costs, to be successful? Per the President's Memorandum of 1993 and the ECAT Report of 1994, an initial implementation of "a full-scale Federal EC system that expands initial capabilities to include electronic payments, document interchange, and supporting data bases" was to be implemented by July 1995.[61] Was that *really* expected

[57] See GAO Audit, Appendix 20, page 9.
[58] Ibid, page 22.
[59] Appendix 06, page 1.
[60] Appendix 20, page 42.
[61] ECAT Report, Appendix 18, page 1-6.

by DoD to be complete, including document interchange, without the participation of any significant number of vendors?

At the vociferous complaints of the VANs, DISA appealed to, but could not shut down, wildcatting Agencies and purchase points that were utilizing Electronic Bulletin Board Systems (EBBS) and other means apparently to circumvent and/or undermine FACNET and its inherent threat to their existing decentralized worlds. While a January 1996 Audit Report by the DoD Office of the Inspector General[62] that reviewed six such offices employing EBBSs came to the conclusion that there was no abuse of Federal guidelines, the report did state that those officials blamed the continued use of such systems on FACNET as it "was not fully operational." The Report stated that "no clear information is available on what constitutes fully operational." However, this goes against the FACNET policy which dictated that once two or more vendors for a particular Agency were registered offering a particular SIC code or FSC code, requests for any products in such groups would thereafter have to be made via FACNET EDI by that Agency. The audit group apparently did not bother to interview suppliers who used the EBBSs as they reported to the VANs that there was no reason for them to switch over to FACNET under the circumstances.

The Government also didn't anticipate the effect, in terms of real or perceived threat of job loss that FACNET had on various personnel levels within DoD purchase processes. Individual purchase points, in addition to running their old EBBSs, also continued or started to use facsimile, the World Wide Web, eMail, and other means to subvert FACNET's initiatives, or to at least get around its problems.

> In 1995 less than 2 percent of about 2 million federal procurement actions valued at $2,501 to $100,000 – FACNET's target dollar range – were accomplished through FACNET.[63]

This resulted in a vicious circle whereby customers would refuse to commit to signing-up with a VAN because FACNET's data volume didn't justify their participation, and the number of vendors registered was so low that Agency purchase points couldn't attract bids through FACNET and felt forced to use other means. The Defense Logistics Agency (DLA), generator for about half of the EC transactions initially mandated for DoD's use of FACNET, to this day has yet to become integrated with the NEPs, still utilizing a competing communications process and essentially ignoring FACNET ICs and/or other standards. ALR has never understood why this was allowed, why ALR was in effect forced to develop and maintain custom support for this "double face to industry" as the Pat Report explicitly states:[64]

> two of the Megacenters will connect directly with all VANs who choose to participate as part of the DoD EC/EDI distribution process. While all Megacenters will interconnect and connect to other Government distribution points, **all EDI transactions destined for trading partners connected to VANs will be routed to these DoD Distribution Hubs** [Emphasis added]

[62] DoD Use of Electronic Bulletin Boards in Contracting, Appendix 21.
[63] GAO Audit, Appendix 20, pages 2-3.
[64] Appendix 01, pages 126-7.

and adds:

> DLA has utilized DAASC in Dayton, Ohio and the Navy has utilized ASO in Philadelphia, Pennsylvania. ... Both of these sites are scheduled for migration into a DISA Megacenter during the next three years.

DLA was never interim FACNET certified.[65] It is interesting to note that DLA was one of the greater "offenders" employing EBBSs for posting RFQs and receiving electronic bids. DFAS was another DoD Agency that refused to utilize the FACNET infrastructure. Its "customers number in the millions ... [and it] pays an estimated 5 million contractor invoices each year."[66]

Meanwhile, the Government was having its share of problem with its internal infrastructure used for the transfer of EDI transaction between the many Agencies, their Gateways, and the Hubs (also called NEPs). DoD claimed that these problems were finally circumvented, but not until the implementation of "the Electronic Commerce Processing Nodes on November 1, 1996."[67]

As this situation continued the supplier base refused as a whole to make any investment or commitment to EDI and the computerization it required until they could see circumstances change enough to force them to either commit or close doors. Eventually FACNET imploded; and as early as May of 1997[68] new legislation was proposed and/or passed that threw out or diluted original mandates of the Federal Acquisition Streamlining Act of 1994 (FASA). The Government, as early as in the 1996 analyses of internal watchdog Agencies, had failed to provide enough resources on time to meet its schedules and thereby had mismanaged the FACNET initiative.

In the GAO report on FACNET's problems, a preponderance of those interviewed indicated that the following factors had effect beyond "a moderate effect" to either a "great extent" or "very great extent":[69]

- Lack of effective policy leadership.
- Lack of effective government-wide program management.
- Lack of effective FACNET engineering and operational management.
- Lack of well-defined CCR database that is well populated and operational.
- Lack of a sound FACNET infrastructure that works "end to end"

---

[65] At least throughout the period of VLA-1.
[66] Appendix 01, page 68.
[67] GAO Audit, Appendix 20, page 22
[68] Appendix 19 shows one such example.
[69] GAO Audit, Appendix 20, page 33

To these points ALR takes exception only with the latter. While ALR was not in an ideal position to understand what took place on the other side of the Hubs, except by inference, the architecture seemed to be quite well designed, put together, and operated at the Hubs (particularly Ogden), certainly by the end of the two-year schedule. Other VANs surely would have been expected to have more difficulties interfacing their older, commercially-oriented technologies to the more state of the art Internet technology solutions the Government deployed. ALR, with its high-tech GAP-Net solutions designed expressly for all FACNET specifications, encountered little difficulties beyond the not unexpected start-up problems, and therefore the ALR VAN operation was deemed by DISA as one of the least problematic of the participating VANs.[70]

But despite the dedication and extensive effort of the myriad Government forces designing and implementing so much of the FACNET architecture in a very short time, much of what was accomplished was indeed not done on schedule, to quite some extent due to the huge scope of undertaking that exceeded overall Government expectations or understanding. In addition, various needed resources were not made available in sufficient quantity and time. Upper Government management did not provide the clout necessary to bring wildcatting Agencies into compliance, as diverse factors at various levels, seemed more concerned with parochial priorities than those needs of the Government as a whole.[71] In retrospect, this was perhaps not surprising, it being a common trait of humanity to resist change. And FACNET was a promise, or threat, of huge change, with far-reaching effects, that stretched beyond the Government's initial vision, committed resources, and inadequate schedule.

## The Breach

The VANs, investing heavily in Government promises of future business and profits that now clearly were not to materialize, found themselves facing very significant losses. Accordingly, certain VANs, primarily those that had made the greatest commitments to FACNET, in terms of technical, human, and financial resources along with future prosperity and viability, started to file suit against the Government for breach of contract.

In the first such case, the appeal of *GAP Instrument Corp.* in Armed Services Board of Contract Appeals (ASBCA) No. 51658[72], the Board found that the

> *Government made a promise which it did not keep... the promise had business value ... because ... contractors ... would have had no choice but to use the services of the ... VAN providers of which appellant was a member. .. [A]ppellant has shown that the issue of damages is not purely academic and that appellant has incurred some damage.*

[70] In the ASBCA's *GAP* decision, this statement was attributed to GAP operations; but as both the GAP and ALR VANs utilized the underlying GAP-Net infrastructure, the point would equally apply to ALR. See Appendix 05, page 9.
[71] Note that in GSA's response to the GAO Audit, GSA makes the point that "Federal user agencies share responsibility for the difficulties in the FACNET implementation." Appendix 20, page 36.
[72] See ASBCA's *GAP* decision, Appendix 05.

Quantum determination was left to future processes and it is to such process that ALR is hereby applying, in that it has been established that the decision of the Board in the above case has applicability to the other VANs who have filed for damage relief utilizing the same arguments under the same contract.

In the ASBCA decision in *GAP Instrument*, three significant breaches of the VAN License Agreement were determined to have been made by the Government:[73]

- By allowing agencies to deal with vendors via alternative means, outside the designed "single face to industry," DoD failed to enforce those provisions of the VLA that mandated that the VANs exclusively be used by the Government for all transactions specified to be handled via FACNET. As stated by ABSCA in response to the *CACI* Appeals Numbers 53058 and 54110:[74] "The government breached the no-cost VLA when it did not timely complete the implementation schedule incorporated by reference into the VLA and when it did not follow-through on its "single face to industry" approach." The maintaining of existing methods of electronic forms of procurement, such as electronic bulletin boards, facsimile, eMail, and others, along with the egregious "second face to industry" maintained throughout the period of VLA-1 and beyond by DLA, are clear examples of this particular form of the Government's breach.

- The Government failed to deliver on its VLA contractual obligation to force its identified supplier base to select one of the certified VANs as their sole interface to the Government for all procurement actions that were mandated to be performed via FACNET. By encouraging vendors to continue to produce responses to the Government through means specified in the previous paragraph, the Government committed the breach of failure to "require all contractors desiring to electronically conduct business to only do so with a participating, fully tested, EDI VAN Provider."[75]

- The DoD failed to maintain FACNET's schedules by not meeting the requirements of the Statement of Work and the Implementation Plan referenced in the VLA nor by being able to provide the required systems, interfaces, and more importantly, sufficient motivation to realize the registration of vendors with CCR in a timely manner, thereby obviating their mandate to participate in FACNET. The failure of the Government to induce vendors to register with CCR in accordance with the migration of their serviced DoD sites as specified in the Implementation Plan, resulted in much less than 2 percent of these vendors ever being registered and therefore undermined the Government's VLA mandate to "require registered vendors to exchange all electronic transactions via a participating EDI VAN provider ... in accordance with a DoD-wide implementation plan."[76] ALR offered free registration services to potential registrants via FACNET-specific EDI transmissions to induce sign-ups, but was forced by the Government to discontinue such usage while CCR registration was closed down for the extended

[73] Ibid, Appendix 05.
[74] See ASBCA's Decision Re. CACI, Appendix 22, page 43.
[75] ASBCA's *GAP* decision, Appendix 05, page 5
[76] Ibid.

period until it was eventually redesigned and reopened, about the time that the original two-year period of implementation ended. At this point the Government provided a free service that vendors could use directly, thereby violating the provision in the VLA that "Before conducting electronic commerce with DoD, all contractors must register using a simple electronic registration transaction sent to DoD via a participating VAN provider."[77]

In another breach of the VLA, not specifically identified by ASBCA as a breach in its *GAP* decision, but brought out in testimony during that hearing, the Government signed an agreement with NTIS, to provide them a direct link to the Government's internal NIPERNET to acquire CALS and other Mil-Spec binary data, which NTIS sold to the contracting community, thereby violating the VLA requirements that "All binary data will be exchanged in ASC X12 841 transaction sets"[78] and "All electronic transactions will be exchanged via the multi-VAN DoD Hubs. All contractors will send and receive transactions via one of the participating EDI VAN Providers."[79]

Because of these irrefutable breaches of the VLA, the Government wrongfully denied ALR the opportunity to acquire its appropriate market share of the 300,000+ vendors identified by the Government as ASBCA found that "appellant could charge fees to contractors which, had the Government kept its promise would have had no choice but to use the services of the ... VAN providers."[80]

In addition, ALR believes that there was another breach of the VLA by the Government, probably more egregious and damaging than those that have heretofore been specifically identified by the ASBCA. The VLA called for DoD-wide implementation, DoD Implementation Conventions, and VAN support of only DoD Agency requirements. But from October 1994 onward, with the signing into law of FASA, VANs were required to support a *Government-wide* implementation, *Federal* Implementation Conventions as well as DoD ICs, and to build and test an infrastructure to support *Government-wide* Agency requirements. The Government expanded the scope of the statement of work, in various respects doubled it, without changing the VLA's Statement of Work, all without providing any compensatory consideration thereto for the VANs' additional effort, costs, and risks.

The reason that we claim that this breach may well have had a more egregious effect was that the PAT Report Implementation Plan was self-described as being a very "aggressive" undertaking. With it, DoD had already likely bitten off more than it could chew; but with the addition of their support for the whole Federal side, their efforts were also doubled in various respects, and there can be no doubt that this additional burden increased implementation delays, resulted in numerous needs for redesign and resystemization of the system architecture and supporting infrastructure, and required more resources, particularly for the operational components such as the NEPs and VANs.

---

[77] VLA, Appendix 2, page A-15
[78] Ibid, page A-9.
[79] Ibid, page A-15.
[80] ASBCA's GAP decision, Appendix 05, page 15.

For example, the network architecture and the computer processing capabilities of the NEPs had to be increased in order to handle the additional burden of all the Federal side Gateways and their expected vendors, the number of ICs that had to be developed, tested by all appropriate parties for certification purposes, and implemented doubled, and a major factor in the need for the Government shutting down CCR for a year was that CCR had originally been designed to support DoD-specific needs, but now had to provide access by and support for all the varying Federal Agencies and their needs and this created considerable security issues as the system had to meet all those needs, while maintaining varying strict security allowances and limitations based on combinations of Agency and functional boundaries. This latter point surely ties into the second ASBCA-established Government breach (as shown above) of the Government not requiring vendors to become participants and thereby damaging the VANs by denying them opportunity to make a profit.

The Government had the right, and more importantly, the responsibility, to address the change of project scope and VAN responsibilities by amending the VLA to reflect the new requirements imposed by FASA. It did not, and this forced the VANs to perform to many requirements and to support numerous initiatives that were clearly outside the defined terms of their contract, i.e., the VLA.

The Government should clearly have understood that this was a billion dollar annual market considering the number of transactions and participants it projected against the prevailing VAN costs of the time. That the revenues which the VANs should receive were fully expected by both the Government and the VANs cannot be denied, as they formed the very foundation upon which the VAN License Agreement was constructed by the Government itself. As the ECAT succinctly put it:

> VANs have the potential of making a significant profit...[81]

## Additional Government Damage to ALR

Aside from various start-up operational problems, the major problems ALR had with the Government tended to be administrative. That is not to say that the operational problems caused by the sudden mix of so many Gateways, Hubs, and Testing Centers weren't significant in various respects. Because the GAP-Net VANs typically were the very first VANs to begin any new testing initiatives with JTIC and other Government testing facilities, they were faced with the task of debugging the routines, procedures, and data sets that were used by the Government to effect their testing scenarios. As the Government did not have a satisfactory method of validating their own test data to FACNET standards (as defined in the VLA), the full validation routines integrated into the GAP-Net *adVANtage* systems would find a considerable number of instances wherein the Government's testing material was incompatible with FACNET ICs. Continually reporting this did not endear the GAP-Net VANs with the respective testing centers, as we kept ending up in situations where we were testing them more than they were able to test us, and they kept being embarrassed by such recurring problems. In fact, it actually

[81] ECAT Report, Appendix 18, page 3-30.

took some time before they finally got up to speed enough to even be able to accept that the many errors we were reporting were, for the greatest part, truly valid. Eventually, in order to make the process less painful and time-consuming for both sides, GAP-Net provided JTIC with *EDIVALID,* a stand-alone, loaner version of our internal table-driven EDI transaction set validation routines. With that program in place at their site, JTIC could perform validation of their own test data sets prior to outbound transmission thereby precluding to great extent their sending out of invalid data which could only result in aborted tests.

While that tool significantly improved relations between JTIC and ALR, a subsequent incident certainly created another rift. For a combination of reasons, ALR placed embedded copyright statements within the test data that it was required to create and provide to the Government as part of the testing process. ALR had early recognized the high value of rapidly achieving as many certifications as possible, thereby establishing a significant competitive advantage over other VANs. Naturally, ALR wanted to protect the investment that it was entrusting to this strategy. Therefore, one can imagine the horror we felt when we subsequently learned that not only was the Government not protecting this ALR intellectual property, it was in fact using our submitted transactions as its own outbound test data sets and sending them back out to our competitors as part of the JTIC testing scenarios, complete with the ALR copyright statements still embedded! There is no way of knowing just how helpful this may have proven toward other VANs achieving those few certifications that they did.

In another instance of Government misuse of ALR intellectual property, DISA evoked a VLA clause that required us to provide them with a mailbox and all "user documentation," extending this to include GAP-Net proprietary networking architecture diagrams and documentation. This occurred shortly after December of 1995 when ALR had a main transmission trunk line go down for a period of 45 days. Due to our proprietary triple interlocking network design, we were able to transfer operations to a secondary site and return to full operation in fifteen minutes. DISA, obviously impressed, apparently studied our design as the architecture was used in the system specification of VLA-2 and thereby distributed to our competitors. When ALR complained about this breach of confidentiality (the submitted documents were marked as being proprietary and confidential) and asked for the return of the materials, ALR was officially told that they had been lost by DISA, that they could therefore not be returned, and that the Government had nonetheless unilaterally decided that ALR had no basis for recompense.[82]

[82] See Appendix 30, Denial by Contracting Officer of ALR's Claim of Government Misuse of ALR Intellectual Property.