# ADVANCED LOGIC RESOURCES INC.
## NOTES TO PROJECTED STATEMENT OF INCOME AND EXPENSES
## VLA1 CONTRACT PERIOD 2/3/95 THROUGH 9/17/1997

Note 1: Revenue

Advanced Logic Resources Inc (ALR) projected obtaining twelve percent of the PAT report's estimated 300,000+ suppliers at an annual contract rate of $3,600 ($3,200 average annual fee after discounts). Please see discussion of market share and contract price in the marketing report contained in this package. Due to the nature of the VLA contract, it was anticipated that there would be a rapid ramp-up of customers. Based on assumptions contained in the marketing report, ALR estimated signing on 14,616 trading partner accounts in the first calendar year of the contract and 21,136 in year two, followed by 1,129 in the last two months of VLA-1. For purposes of simplicity, assumptions were made that there would be no new customers after this 12 percent, or 36,000 customers, were signed on. However, there certainly would have been renewals of customers that would have continued on their sign-up anniversary date until the 17th of September, 1997, when VLA-1 was terminated. Arguments as to whether or not such renewals should have been continued to be expected under VLA-2, as surely would have been the case, are disregarded herein.

Note 2: Churn

These figures do not allow for churn, which is the term used to describe the abandonment by customers from one VAN to another, as well as drop-outs from FACNET. It could also be construed to include the unknown thousands of brand-new vendors that FACNET was supposed to attract with its simplified acquisition processes and increased competition opportunities. However, even ignoring all the expected new vendors, had churn been considered, it is clear that this would have resulted in increased revenues for ALR, rather than losses. This is because it would be far more likely for customers that signed-up with a big-name, but minimally certified VAN to realize that they were not getting full services due to the fact that said VAN was not authorized to process so many of the different FACNET transactions, rather than the other way around. Another factor that should have resulted in net gains of migrating customers for ALR would have been caused by them receiving higher bills than what had been advertised, due to the increased size, and resulting transmission times, of FACNET's specialized transaction sets, as multiplied by the various hidden costs of traditional VANs. And still another reason for expecting that ALR would maintain a positive churn rate is that ALR offered advanced capabilities such as high-speed internet access and custom interfaces that would have proved increasingly attractive to larger and more aggressive companies, particularly as FACNET expanded its operations in other areas beyond very basic levels of procurement.

Note 3: Additional Revenues

ALR was targeted toward those customers that would have special needs beyond that of the typical, medium-sized supplier. Accordingly, ALR offered numerous extras, such as

custom software or hardware for interface to existing or new customer computers and application systems, special training programs, increased bandwidth connectivity service and hardware to FACNET and the Internet, indeed, most any form of IT consulting, services, and products. However, as the market demand for these items had not yet been established it is very difficult to predict the total extra revenues that would be generated at various points in time. The figures used here are a conservative 3 to 7 percent of the total VAN account sales, increasing across the three calendar years. Unlike more passive traditional VANs that just played a post office role, ALR was very aggressive in its involvement and support for customers and expected to maintain very good vendor relations. Remember, with traditional VANs, customers would constantly find new and increasing charges that would not endear those VANs in customers' hearts. But with ALR, it should have been the opposite case, as customers would have continued to automatically receive or learn of new capabilities while the bundled cost remained constant. Therefore, it was expected that ALR customers would have a much higher regard for ALR than would be the case for other VANs and that it would be natural, and encouraged, for ALR customers to turn to ALR's professional staff whenever any questions or needs arose within the domain of their IT sector.

Note 4: Discounts

For those companies with multiple accounts, it is expected that discounts would have been offered and/or additional incentives provided in order to ensure capture of that part of the market, the heart of ALR's targeted segment. Even for single license accounts, it was expected that there would be discounts to ensure sign-ups. These discounts are reflected in the numbers above, both for original sign-up and for renewals.

Note 5: Cost of Sales

ALR anticipated the need for technical support personnel to assist customers in the technical aspect of the software produced by GAP-Net. Engineers and software experts would be available to customers 24/7 to assist with any issues. As the customers became familiar with the software, the number of engineers and software personal would decrease. ALR initially utilized T1 transmission lines to handle the volume of data exchanged, but these were backed by 12-pair of installed and tested fiber optic cables capable of increasing this bandwidth more than a thousand times over. The additional bandwidth would have been available in needed increments on nearly immediate notice.

Support salaries were calculated at the prevailing rates for technical positions, clerical, etc. A twenty-eight percent rate was utilized to anticipate the costs of payroll taxes, unemployment insurance, workers compensation insurance, disability, and health insurance.

Note 6: Marketing

The marketing plan set aside the sum of $600, on average, for each new customer that signed up. The purpose of this money was to provide for certain incentives to customers and commissions and bonuses to sales people. In addition, a cost of $100 per renewal

has been established here to cover such bonuses, partial commissions, and other incentive factors as may have eventually applied.

Note 7: General and Administrative

ALR anticipated operating, primarily, out of a 100,000 square foot commercial location. Additional, smaller facilities were utilized for off-site backup, redundancy, disaster recovery, and
to address such issues of decentralization of operation and support as may have arisen. Expenses such as utilities, repairs and maintenance, ongoing upgrades to equipment and furniture and fixtures, insurance, and legal, accounting, and other professional fees, were anticipated for these facilities at sums above prevailing rates.

Payroll expenses were calculated using prevailing rates for clerical and administrative personnel. A twenty-eight percent rate was utilized to anticipate the costs of payroll taxes, unemployment insurance, workers compensation insurance, disability, and health insurance.

Note 8: Depreciation

Computer equipment, networking equipment, furniture, and fixtures are depreciated over their useful lives on a straight-line basis. An average useful life of five years is used in this projection.

Note 9: Taxes

Taxes were calculated based on the New York State and Federal corporate tax rates in effect during the time frames covered by this statement.

Note 10: Customers vs. Suppliers

While this projection accepts the pre-established number of applicable suppliers as being 300,000+ for Phase 1 of FACNET, there are non-speculative factors that mandate that the number of VAN customers (e.g., each unique VAN EDI mailbox has to be a separate customer account) would be a significantly higher number. The primary reason for this was that before FACNET the suppliers for DoD were typically identified by 5-character CAGE Codes. CAGE Codes, and also telephone numbers or any of the many other identifiers as allowed by the X12 standards, were originally planned to be used as the unique Sender/Recipient identifiers in the electronic "envelopes" of all X12 transmissions. However within the VLA-1 time period, FACNET developers soon came to the realization that it would be necessary to standardize on only the finer granularity of 9- and 13- digit D-U-N-S Numbers.

Whereas a particular company might have a single CAGE Code that up to that point was used to identify it whenever and wherever the company reregistered and conducted business with the Government, D-U-N-S Numbers are assigned by Dun and Bradstreet to uniquely identify all business entities and locations. So there are expected to be separate D-U-N-S numbers not only for a Corporation itself, but also for all of its

subsidiaries, as well as for their separate locations. In addition to any of these primary D-U-N-S Numbers that are assigned by Dun and Bradstreet, the 13-digit D-U-N-S Number allows a company to assign its own subordinate unique D-U-N-S numbers, so that different plants, departments, supply points, and contacts can be uniquely identified, as required by the new centralized registration process instituted at CCR, or as may be requested as convenient by various Government purchase points.

While it may be feasible that a larger company could register and exist in FACNET with a single D-U-N-S Number and CCR registration, as soon as it became necessary for the company or the Government to separately refer to any particular supply point or individual contact, an additional D-U-N-S Number and registration, and therefore VAN Mailbox and Account, would need to be established. Both the companies and the Government would expect this; otherwise in a company like Grumman, for instance, orders for canoe paddles and F-14 ailerons would have to be sent by the VAN to the same mailbox, from which the company would have to somehow sort and forward such orders (containing no specific identity!) to the particular subsidiary, city, plant, supply point, and contact who would respectively handle each item. As soon as there is a need to uniquely identify the end contact, there must be a corresponding unique D-U-N-S Number registered, thereby allowing the efficient transfer to/from the specific contact via a unique VAN mailbox and account. This is not an ALR rule, but a FACNET necessity. The level of service and support provided by the VAN, and the respective needs for an end-user computer and FACNET-specific software to process the EDI transactions, should be the same for each subordinate account of a large company as would be expected for the single account of a narrowly focused company, which explains why the pricing for each was set the same.

The conservative figures used here to calculate the extra number of accounts required by all the vendors signing-up range from 1.5 percent to 4.5 percent of total actual vendor accounts (CAGE Codes), increasing yearly, as customer needs would be expected to become more sophisticated with increased system familiarity by vendors and Government expansion of FACNET.

---

From the total Net Income of $138,420,000 shown in the above projection, ALR hereby drops $420,000 to more than cover the actual revenues that were received during the period shown (while ignoring such whole or partial refunds as may have been demanded by customers due to the non-performance of FACNET). Therefore, the claim of ALR's total Loss Profits under the VLA contract is $138,000,000.

## ALR's Lost Profit Summary

There is absolutely no doubt that the lost profits shown above in the Projected Financial Summary were foreseeable by both the Government and the VANs, as it was only the anticipation of such profits that enabled the unique situation of the VANs providing such a tremendous value of free services to the Government.[98] In fact, prior to, and continuing through the period of VLA-1, the Government consistently discussed with the VANs and jointly worked towards its plans to expand FACNET and, by effect, the VANs' marketplace, moving well beyond the limits of acquisition to myriad other applications, increasing far, far beyond the 300,000+ vendor participants of the first phases of VLA-1, to multitudes of agencies beyond DoD and eventually to a world-wide scope via EDIFACT. One small example of this projected future can be seen in the high-level pictorial of the DoD Long-Term EI Strategy touted by DoD in officially sanctioned EC/EDI seminars during the VLA-1 timeframe:




Figure 5 – Note future application areas of Medical, Transportation, Finance, Logistics, etc.
Source: SBA/DoD EC/EDI Implementation in Contracting Handout, 1995, page 60

In the ASBCA decision in *GAP Instrument*, three significant breaches of the VAN License Agreement were determined to have been made by the Government:

- By allowing agencies to deal with vendors via alternative means, DoD failed to enforce those provisions of the VLA that mandated that the VANs be used exclusively for all transactions specified to be handled via FACNET.

[98] See the conservative estimate of the Total Cost of FACNET VAN Services, Appendix 07

- The DoD failed to maintain the VLA's referenced schedules by not meeting the requirements of the Implementation Plan specified in the PAT Report and by not being able to provide the required systems, interfaces, and motivation to allow vendors to become registered with CCR in a timely manner.

- The Government failed to deliver on its VLA contractual obligation to force its identified supplier base to select one of the certified VANs as their sole interface to the Government for all procurement actions that were mandated to be performed via FACNET.

By these judicially-established breaches of the VLA, ALR wrongfully was denied its expected market portion of those profits, herein conservatively established as $138 million, as would have been gained by acquisition of its share of the 300,000+ vendors identified as being mandated participants of FACNET during Phase 1 of VLA. Further, although not claimed herein, ALR was denied opportunity for its share of additional profits that should have accrued from servicing all the new and additional vendors of DoD and other Government agencies. FASA mandated "Government-wide implementation." Such implementation should have followed in subsequent phases under the VLA had FACNET succeeded as was expected and promoted by the Government. All these profits were fully anticipated by both the Government and the VANs as they were the very foundation of the VAN License Agreement, which was so designed by the Government itself.

## E. SUMMATION

**ALR and the VLA**

In understanding ALR's position relative to the VLA it is necessary to go beyond the various clauses in the VLA and understand what the real intent was that the Government hoped to achieve overall, and to place the VLA (and its references) in its proper place in support of such goals.

ALR was very impressed by the existence of FASA, which **mandated** that FACNET not only come into existence but that it meet very specific goals such as Government-wide implementation of EDI by 1997. This was **LAW!** — ALR therefore firmly believed in its Government, and the fact that the Government **by law had to**, and therefore **would**, meet all the dictates of FASA. Certainly, ALR strongly believed that FACNET would all have to happen in reasonably close approximation to the objectives the Presidential Memorandum originally laid out (that FASA later made law) and that were subsequently detailed in the PAT Report which, as determined in ASBCA's *GAP* decision, contained the two-year implementation plan referenced in the VLA.

But the scope of the FASA initiative was tremendous. So much so that many players of the time, and those forced to look at it today, find it very hard to grasp a full comprehension of how huge an undertaking this really was. Just one indicator of this scope was that it is indisputable that the annual market value for the VANs' single slice of the entire FACNET pie was at or above one billion dollars per year (ignoring the possibility of VANs doubling their fees to make up for not charging the Government's share). Now maybe that seemed like chicken-feed to our good representatives in D.C. at the time who had this country over four trillion dollars in debt, but to the rest of us that's an amazingly large sum. That the Government was planning in the space of two short years to take what already was a burgeoning, expensive world of EDI and abruptly more than quadruple it in two years, then quadruple *that* in another four years or so, surely seems to be in the realm of the impossible. And, for the Government, that sadly proved to be the case.

In order for FACNET to have been successful, the five major components of its architecture[99] **all** had to get to the same state of basic operational readiness at the same time:

- Government Purchase Sites — The many Government (i.e., DoD for the initial two-year phase) purchase sites, dispersed throughout not only the country but the whole world, had to nearly immediately become EDI compliant. Asking this of various entities some of which did not even have a computer at the start is undoubtedly a very ambitious undertaking. But that is what the Government did — which wasn't enough. The Government had to demand this in no uncertain terms. Yes, there were Government orders that came down, but how many of the slackers, or the actual FACNET saboteurs at various sites, were summarily fired

[99] Or at least a significant subset of each of the five components.

for their refusal, or proactive antagonism, to this requirement? It should have been made clear by the Government not only in word, but through swift, concerted action, that this was *law* and that it *would* be done or heads would roll. Unfortunately, as later identified in various Government audits of FACNET's problems and resulting failure, the Government did not have sufficient managerial understanding, resources, or resolve to make this happen across the board in a timely manner. That is not to say that it wasn't successful in some areas such as perhaps the various purchase points utilizing MADES, APADE or SACONS; it surely was able to get many sites to FACNET certified levels. But such successes, as demonstrated by FACNET's ultimate failure, were not enough to overcome the effects that the dissidents had on the vendor community. There was a tremendous learning curve required for the participating purchase points that needed to be overcome, and unfortunately, there were local concerns on top of that, which were placed above the needs of the Government as a whole and rarely, if ever, corrected.

- Gateways — For the Gateways, those supra-Agency sites that were responsible for providing the EDI collection from all of their subordinate purchase sites, converting or validating all transactions to/from valid X12 standards, and providing the upward interface with the Government Hubs the story was not dissimilar. Here the number of Gateways that worked very hard to get on line and perform their assigned tasks, while often under-manned and swimming in generally unknown waters, was respectable. But their work was clearly offset by those other Agencies that outright refused to become part of the FACNET architecture, the most notorious probably being DLA and DFAS. Had these two Agencies been brought on to FACNET at the very beginning, instead of never, the fact that the former had 1.3 million procurement actions in 1995 and that the latter controlled the vendor's payments would have been terrific inducement for vendors to join FACNET, rather than allow vendors to follow the example these Agencies set toward shunning FACNET. The key, as the PAT Report so succinctly established, was for the Government to present through FACNET a single face to industry. That it couldn't, and/or wouldn't, sealed FACNET's fate.

- Hubs — The Hubs, just as was the case for most of the Government sites and Gateways, had a tremendous amount of infrastructure to design, implement, test, and learn how to operate and support. As everyone seemed to think that because they would just be passing good old standard X12 transactions this should all be relatively easy, there clearly were not sufficient plans for the level of operational problems that naturally ensued. This resulted in at least two major revisions of the architecture and procedures of the Hubs, with of course, resulting paralyzing delays. Although to a great extent the Hubs (particularly Ogden) seemed to present much less of an overall problem to the FACNET situation, there certainly was a perception of this and certain Gateways and non-complying DoD sites used this as an excuse, rightly or disruptively, to justify their varying degrees of non-participation. But as a VAN connecting directly to the Hubs many times a day, ALR had the opportunity to see the progress and problems in this particular arena on a continuing basis. Support towards identifying and resolving various operational problems with the transactions being passed was clearly an issue, but

for the most part, the physical requirement of exchange of transactions with the VANs went quite well for VANs such as ALR that had appropriate forms of connectivity and sufficient levels of bandwidth. It is suggested here that those VANs that may have experienced considerable difficulties in this area were more likely those that were relying on their outdated or underpowered technologies and procedures and therefore must share in the extent of such problems wrongly tagged more exclusively as belonging to the Hubs.

- VANs — Clearly the VANs were a critical link in the chain of communications which was to carry all transactions from Government agencies to their trading partners in the commercial sector. A major mistake committed by the Government was the belief per the PAT Report that "Including VANs in the DoD integration process will ensure that the distribution process is designed and implemented consistent with existing commercial VAN support capabilities." With that approach in mind and with only the mandated utilization of standard X12 transaction sets, the Government seemed sure that there would not be a great many problems with the VANs, as the commercial VAN community was expected to pretty much all be respected, well-experienced, and therefore capable players in the EDI world. For the EDI world as it had heretofore been known, which was a one-to-one model between deep pocketed, broad-capability trading partners, that shouldn't have been a bad assumption. But the Government's FACNET architects "designed and implemented" requirements of VAN testing and certification, full EDI validation to the specific IC level, and most importantly the imposition of a one-to-many model with huge bandwidth requirements that totally dwarfed existing VAN operations, and this turned FACNET into a brave new world in which many of the major VANs feared even to tread. That the traditional VANs had operational troubles with this new world should not have been such the surprise that it was. In retrospect, it is clear that only the sort of high-bandwidth, FACNET-from-the-ground-up solution offered by ALR with its GAP-Net technology and new pricing model could be expected to be equal to these new requirements, even though both the old and the new models were constructed on top of the standard foundation of X12.

- Vendors — The vendors, being businessmen, needed to make business decisions regarding their future. As a body, they soon made it clear that they needed to receive a no-nonsense, clear-cut justification for them to become FACNET-compliant. This should have come in the form of inescapable mandate from day one of the project. But it didn't actually happen until four years later when the Government finally realized its tremendous strategic error in this regard and belatedly told vendors that they would not henceforth be paid for any work performed unless they were registered with CCR, which quickly resulted in well over a 100,000 vendors finally registering. Clearly, this type of motivation was necessary right from the beginning, because, as we all too convincingly learned, you can't have a successful FACNET without vendors.

The Government made a huge mistake expecting that the VANs, battling for their own lives to stay afloat in FACNET's operational storms while wallowing under their burgeoning loads of developmental costs, would have any leverage at all in initially motivating the vendors. Only the Government, with its mother's milk of

Contract money, had that without which the vendors could not live. The Government, so concerned with its internal, aggressive schedule, and mounting problems list, basically forgot about the vendors. They really never understood just how difficult and painful it could be for vendors to become truly FACNET and EDI compliant, technically, financially, and attitudinally.

In fact, this problem goes all the way back to the PAT Report which in its Phasing Plan[100] called for RFQ, RFQ Response, and PO transactions (X12 sets 840, 843, and 850) to be phased in during "PHASE I six months" while the Trading Partner Profile (X12 set 838) was not even scheduled to be phased in until "PHASE II one year." As the VLA mandated that "all contractors must register ... via a participating EDI VAN Provider"[101] who must "provide any interested subscriber the capability to complete ... the ASC X12 838 transaction set following the DoD implementation conventions"[102] "to conduct business with DoD activities"[103], how was FACNET supposed to accomplish anything with those initial phase 840s, 843s, and 850s when the 838, necessary for vendor registration which was in turn mandatory prior to vendor participation in FACNET, wasn't scheduled to be available for at least a half year later? Clearly, the Government designed a horseless cart in this regard that it didn't completely fix until years later, long after the seeds of vendor discontent and distrust had firmly rooted, overrun the FACNET landscape, and given fuel to internal detractors of FACNET to help them escape its impending grip of change over their little worlds.

As much of a problem as the X12-compliant requirements were for the Government-side entities, the problem was more than a hundred times greater on the vendor side, where many of these businesses were very small machine shops or similar operations, already mired in a DoD down-turn, that didn't have the cash, let alone the legal mandate the Government had, to commit to such an unknown world of EDI, computers, and networking unless these were truly forced upon them. And even if some vendors were prepared to commit, their only choices for getting over the initial mountain of EDI-compliancy would be through those VANs or VASs that could provide them with fully FACNET-compliant software and only the GAP-Net VANs ever proved capable of that, no other VANs achieving beyond a minimal degree of such certifications at best.[104]

A failure in any one portion of the above described five links in the FACNET operational chain meant that FACNET's hopes of succeeding would be shattered. As shown in the PAT Report, the Government performed a considerable amount of up front risk analysis[105] but when the battle was truly joined, they seemed to forget all about that, merely trying to keep their own heads above water. The old adage well applies of not

[100] Appendix 01, Section 2.10.3.
[101] VLA, Appendix 02, page A-15
[102] Ibid, page A-21.
[103] Ibid, page A-20.
[104] No other VAN or VAS certified, during the two-year DoD implementation phase, to be able to process as much as 15% of FACNET's specified transaction sets. The average was under 5% for the thirteen non-GAP-Net VANs/VASs that had achieved any certifications. See Appendix 04.
[105] Appendix 01, pages xiii-xvi, 163-197.

remembering that the original mission was to drain the swamp when suddenly up to one's donkey in alligators. In retrospect, it would have been wise for the Government to address some of its failings simply by revising the VLA, which it had given itself the unilateral right to do, thereby establishing new plans and schedules, delineating certain changes of project scope or architecture as they became necessary, and regrouping to marshal its forces with a winnable battle plan. But the Government never managed to consider this possibility, so concerned was it with the immediacy of trying to fix the many problems at hand.

This same situation of problem-induced stress certainly applied to the VANs to which even ALR, as successful as it was, can attest. The VANs suddenly found themselves out of their customary element, due to the various, seemingly minor, but really far-reaching wrinkles that the Government had thrown into FACNET (see samples under the *VANs* bullet above). As large as some of the more recognizable VAN names may have been, in this particular world the Government was truly King and it seemed to behoove VANs to try and weather the storms of problems by simply appealing to the Government for relief. In retrospect, it may be easy to say that the VANs should have demanded that the Government stop competing against itself and the VANs, that the Government force the vendors to sign-up with a VAN and register, that there be demands for more realistic plans and schedules, more coordination between the Government and the VANs as the PAT Report had envisioned, and that the vendors be dealt with in a manner that forced them to comply while giving them confidence in the process.

But the truth was that nearly all the VANs suddenly found themselves in a world that couldn't work according to their existing models and they were so busy trying to cope with that, as the pressures of their internal problems and rising developmental costs continued to escalate unrelieved, they really had no place, nor real opportunity, to which to turn. Yes, the VANs did complain to the Government about the vast majority of these issues, but the VLA dealt all the high cards to the Government. The VANs, short of walking away and simply swallowing all their to-date losses, really were trapped by the combination of the insidious way that the VLA was written, the Government's mistakes in its design and management of the project, and the many firestorms that occurred on a day-to-day basis that kept the attention of both VANs and Government away from the grand plan as a whole. The VANs as a group really didn't have a forceful say in the matter, despite the Town Meetings and Teleconferences held by DISA. And as for ALR, we were too busy making sure everything works on our side and on the Government's side. Being nobodies at the outset, it took awhile for DISA to come to recognize and appreciate our expertise and commitment to FACNET. But all the VANs were immediately placed by the VLA, operational circumstances, and the Government's own lack of proper management focus, into a reactive state, where all they could do was hope that the Government's promises would sooner, rather than later, somehow come true. As we all painfully learned, such hope was unfounded, in that FACNET didn't really start to get its act truly together until it's FASA mandate was being declawed and dismantled by numerous other forces, almost entirely from within the Government itself.

## Conclusion

As demonstrated in the previous discussions and supporting documents, the Government committed a breach of the VAN License Agreement,[106] resulting in significant damage to any conscientious Licensed VAN operating under that Contract. As determined by ASBCA in the *GAP Instrument* decision[107] supporting this Claim for that breach, relief for these damages properly takes the form of recovery of lost profits.

ALR has shown, through expert analysis and supporting documents, that had the Government lived up to the promises and schedules of the VLA, the VAN market share that ALR would have conservatively achieved was 12 percent. This percentage, which translates to a customer base of 36,000 of only those 300,000+ suppliers specifically identified in the Implementation Plan referenced by VLA-1, is more than justified. Even ignoring the many other Government Agencies and their respective hundreds of thousands of suppliers from FACNET's future phases (and upon which expectations the VLA was undoubtedly predicated by both sides),

- ALR's outstanding operational performance during the VLA-1 period of FACNET,
- the many competitive advantages ALR had already established versus the underachieving competition posted by the other DISA-certified VANs[108], and
- the eventual increased dominance ALR expected when full understanding of its many cost-effective benefits[109] became all the more obvious throughout FACNET's rapid expansion,

provide unassailable support for ALR's claim.

In accord with the Government's stated "aggressive" schedule, the acquisition of these customers by ALR would have roughly occurred over the span of the two-year Implementation Plan period near the beginning of the four-year period covered by the VLA. Figure 3 above details how the distribution of acquisition of customer accounts would be achieved by ALR. The financial statements in Figure 5 above demonstrate the net income that would be realized from account sign-ups and renewals during the implementation period, along with the renewal fees that would be realized during the year and a half period between the point when the Implementation Plan ended and the date when VLA-1 was terminated by Government dictate and replaced by VLA-2.

This documentation clearly demonstrates that the lost profits which ALR should have received, but for the Government's breach, would be, with reasonable certainty, at least $138,000,000. This amount is clearly foreseeable, as the Government fully expected such anticipatory profits as they were its "hook" to get the VANs to sign the VAN License Agreement that mandated that the Government not be charged at all, as the Government would require the supplier market to use the VANs' services in compensation for its

[106] Appendix 02.
[107] Appendix 05.
[108] See DoD EC/EDI Certification List, Appendix 04.
[109] See comparison of ALR benefits vs. other VANs, Appendix 03.

establishment of such an unprecedented no-charge arrangement. There can be no doubt that the cause of these losses must be borne solely by the Government, due to its failure to deliver on its promises of market, schedules, scope, exclusivity, and a "single face to industry." As to this last point, the PAT Report's concern of risk clearly was justified: "Industry may perceive the lack of a standard EDI approach as cost prohibitive and inefficient."[110] The amount of damages is clearly within limits of justification, as by existing standards of EDI at the time FACNET was conceived and being implemented, the revenue that was anticipated through distribution by the VANs of the Government's claim of 10,000 transactions per day at FACNET's actual transaction sizes runs well over a billion dollars per year[111]

ALR calls upon ASBCA to accept ALR's Claim of $138,000,000 as fair and reasonable calculation of the lost profits to which ALR is entitled by the devastating effects upon ALR and its personnel of the Government's undoubted breach of Contract, as previously determined by ASBCA in its *GAP Instrument* decision[112]. This claim is based upon the vendor market for the VANs being 300,000 per that ASBCA decision, which number we suggest is drastically low, considering DLA's 639,000 CAGE Codes, the 180,000 vendors of the Veteran's Administration, plus all the other existing and new trading partners of FACNET's Government-wide scope. Should there be compelling argument that somehow proves with reasonable certainty that the distribution of that, or some other fairly established market share between all the VANs results in some changed value for ALR as being most correct, our Claim is based upon such share and our Claim should be proportionally adjustable. However, given the huge competitive lead ALR had clearly established, any change beyond a nominal amount should be impossible to fully justify.

We further submit that the basic tenets underlying this calculation all are well within the scope of the very likely possibilities that should have occurred had the Government not breached the VLA. In fact, they represent a fair and conservative compromise between the various extremes of conflicting analyses of what FACNET was and should have been. We fully understand that this is a very difficult situation in which we have all been placed by the strangeness of the VLA provisions, the late 1994 overlay of FACNET and the FASA Government-wide mandate on top of the pre-existing VLA, and all the ensuing problems and circumstances that resulted, both within and beyond the direct scope of the Government's breach. We have endeavored to seek rational compromise between our fuller interpretations of all the pertinent factors and those of the other parties involved. We are fully prepared to continue that reasonable approach in any meeting of like minds, seeking justice across the many, often conflicting, legal and ethical details that apply to this situation.

In making a decision on this Claim we request consideration of the following points that have been presented in this Document:

---

[110] PAT Report, Appendix 01, page 174.

[111] See Appendix 07. Note that this calculation, using but the single per kilo-Character average cost factor, unambiguously underscores ALR claims that the old model of traditional EDI could not survive to fully support FACNET. Only a high-bandwidth, high-tech, bundled solution makes sense given such huge projected costs using the then existing models.

[112] Appendix 05.

- FACNET was a huge new venture itself, imposed by FASA over DoD's lesser scope as originally contracted via the VLA. ALR shouldn't be faulted as being a new venture because the Government tested and proved that ALR not only worked, but was far and away more capable than any other non-GAP-Net VAN. GAP-Net was chosen by the Government to perform its end-to-end testing due to its unquestioned '*adVANtages*'.[113]

- The VLA was created prior to the existence of FACNET. When FASA mandated FACNET as the vehicle for government-wide EC implementation by 2000, the DoD/DISA/VLA effort all became a part of FACNET under the Federal Electronic Commerce for Acquisition Program Management Office (ECA-PMO). That meant that from October 1994 on, the VANs, and all other knowledgeable players, fully expected that the VAN market was to include all the existing and anticipated new trading partners of the entire Federal Government, not just the DoD slice with its 300,000+ identified initial phase vendors.

- Only 2 percent of projected transactions went through FACNET per Government Audits. FACNET simply ran out of energy and commitment before it ever really started to work. Its failure surely was not ALR's fault in any way; it was caused by the Government's management and operational problems, per the Government's own Audits. Consequently less than 2 percent of the expected vendors registered as expected. How could there be expectations that vendors would pay VANs to participate in something that clearly did not work well enough to support their business needs? As the PAT Report predicted in their 1993 Risk Analysis: "Poor execution of EDI may cause the public to lack confidence in DoD EC initiatives."[114]

- The Government shutdown CCR for a year in order to retool it for its internal use, attempting to resolve all the major security and access concerns imposed by the late-1994 switch of the project from DoD-only to Government-wide. This helped to kill vendor confidence and therefore the VANs' opportunities to gain those profits fully expected on both sides. Requoting ECAT, "VANs have the potential of making a significant profit..."[115] When CCR registration was finally restored, the Government provided free access to vendors bypassing the VLA mandate that vendors register with VANS, thereby denying VANs further opportunity to gain customers and realize such mutually expected profits.

- If Not ALR then Who? – Only the four GAP-Net VANs were qualified to process any significant percentage of the various transaction types to be used in FACNET. VANs without certifications could only be pass-throughs, and those were the VANs with the old fast-ticking transmission charges. They needed to combine with some VAS, but there was no VAS with as many as 15 percent of ALR's FACNET certifications. If it really were possible for other VANs or VASs to become more fully certified (certainly not quickly because this was a slow process!), then what is

[113] GAP-Net VANs were the VANs that handled most, if not all, of the DISA EC Infrastructure directed end-to-end testing performed during the VLA period, as can be verified by the DISA ECI Program Manager at the time. A 1998 version of the Testing Process documentation appears as Appendix 29.
[114] PAT Report, Appendix 01, page 173.
[115] ECAT, Appendix 18, page 3-30.

the reason that *none* had been able to do so even a year after the end of the original two-year implementation plan?

On behalf of Advanced Logic Resources, Inc. (ALR), and in accordance with 10 U.S.C. § 2410(a) and 41 U.S.C. § 605(c)(1), ALR hereby certifies that this Claim is made in good faith, that the supporting data are accurate and complete to the best of our knowledge and belief, that the amount requested accurately reflects the contract adjustment for which ALR believes the Government is liable, and that the certifier is duly authorized to certify the claim on behalf of ALR.

/s/ Letty A. Norjen

Letty A. Norjen, President
Advanced Logic Resources, Inc.

Dated: February 3, 2006